810 P.2d 680

**STATE of Idaho, Plaintiff–Respondent,**

v.

**Gerald Ross PIZZUTO, Jr.,
Defendant–Appellant.**

**Nos. 16489, 17534.**

Supreme Court of Idaho.

Jan. 15, 1991.

Rehearing Denied June 5, 1991.

Nicholas Chenoweth, Orofino and Joan Fisher, argued, Moscow, for appellant.

Jim Jones, Atty. Gen., and Lynn E. Thomas, Sol. Gen., argued, Boise, attorneys for respondent.

BOYLE, Justice.

This is an appeal from convictions and sentences imposed upon defendant-appellant Gerald Ross Pizzuto, Jr. Following a jury trial Pizzuto was convicted of two counts of murder in the first degree, two counts of felony murder, one count of robbery and one count of grand theft in connection with the murders of Berta Louise Herndon and her adult nephew Delbert D. Herndon. Pizzuto appeals his convictions and sentences asserting error in certain proceedings, actions and orders of the trial court, and also from proceedings pursuant to I.C. § 19–2827 which provides for automatic review of death sentences.

Evidence at Pizzuto's trial disclosed that Gerald Ross Pizzuto Jr., James Rice, and William and Lene Odom became acquainted in Orland, California. In mid-July, 1985, these four individuals, along with the Odoms' two young children, traveled to Idaho in the Odoms' vehicle. Upon arriving in Idaho they visited some of the Odoms' relatives in the Donnelly area and eventually went camping in the Ruby Meadows area north of McCall.

On July 25, 1985, while camping in the Ruby Meadows area, Berta Louise Herndon and her nephew, Delbert Dean Herndon were murdered and various items of their property were stolen. Gerald R. Pizzuto and his accomplices, James Rice, William Odom and Lene Odom were camping together in a cabin in this same area. Based on testimony given at trial it was determined that on July 25, 1985, William Odom and Pizzuto were planning to rob two fishermen, Stephen Crawford and Jack Roberts, when the Herndons drove by in their pickup truck. However, they abandoned that plan and shortly thereafter Pizzuto left Odom and Rice and walked off in the same direction that the Herndon truck had been headed. At that time Pizzuto stated that he was going "hunting" and walked toward the Herndon cabin, carrying a .22 caliber rifle. Approximately twenty to thirty minutes later Rice and Odom got into their truck and drove up the road looking for Pizzuto. Rice testified that as he and Odom were driving past the Herndon cabin they saw Pizzuto step from the doorway of the cabin holding a holstered pistol. Pizzuto approached the truck and told Rice and Odom to "give me half an hour and then come back up." Rice and

Odom drove back to their cabin, parked the truck, and then walked back to the Herndon cabin. As Rice and Odom approached the cabin they heard what Rice described as "bashing hollow sounds" like that of "thumping a watermelon." After these sounds had ceased, Pizzuto walked out of the cabin carrying the .22 caliber rifle and a hammer and handed Odom a "wad of hundred dollar bills." Odom testified that Pizzuto indicated the Herndons had not believed they were being robbed, and that Pizzuto made Mr. Herndon drop his pants and crawl to the cabin. According to Odom, Pizzuto stated that he "put those people to sleep permanently." Odom also testified that "Pizzuto told the guy and lady that he was a highwayman and that he was going to rob them and the guy didn't believe him and that Jerry said he stuck the gun up to his face and said, '[d]oes this look like a cannon from where you are standing at?'" Rice testified that he took the rifle from Odom and was about to return to their cabin when he heard a "deep snort and some scuffling" sounds from the Herndon cabin. Rice went inside the cabin and saw Berta Herndon lying on the floor of the cabin with blood on the back of her head. Delbert Herndon was lying on the floor, his "feet were shaking on the floor in rapid succession" and he had blood on his face and the side of his head. Rice shot Delbert Herndon in the head because he "didn't want him to suffer."

The bodies of Berta Herndon and Del Herndon were buried in shallow graves that Rice, Odom and Pizzuto dug near the scene of the murders. After the bodies were buried the money taken from the Herndons was divided between the three men. Shortly thereafter the men packed their belongings and placed them into Odom's pickup truck. They then left Ruby Meadows and headed for McCall, Odom driving his truck and Pizzuto and Rice traveling in the Herndon truck. They camped that evening at a nearby hot springs and the next morning deposited the Herndon truck in a wooded area, drove into Cascade and rented a motel room. Several days later Rice boarded a bus and returned to Orland, California. Upon arriving in Or-

land, Rice notified law enforcement officials which ultimately lead to the discovery of the bodies.

Gerald R. Pizzuto Jr., James Rice, William Odom, and Lene Odom were all charged with murder in connection with the victims' deaths. James Rice and William and Lene Odom all pled guilty to lesser charges or lesser sentence recommendations in return for their cooperation with the state. They all testified against Pizzuto at his trial.

An autopsy was performed on the bodies by Dr. Koenen, a pathologist, who testified at trial that Delbert Herndon's wrists had been bound with a shoe lace and a piece of wire. Although Dr. Koenen stated that Delbert Herndon suffered two fatal blows to the head and a gun shot between the eyes which would also be fatal, he was unable to determine which occurred first. Dr. Koenen testified that the injuries to Delbert Herndon were consistent with a hammer blow to the head. In Dr. Koenen's examination of Berta Herndon's body, he noted that her hand and wrist were tied behind her back using a shoe lace and a ligature which was wrapped several times around her right thumb. Berta Herndon's death was caused by two blows to the back of the head by a blunt object, consistent with hammer blows.

Following Pizzuto's conviction a sentencing hearing was held pursuant to I.C. § 19-2515. The trial court ordered the State to prepare a presentence investigation report to be used at the sentencing hearing. This Idaho presentence investigation report, made in 1986, contained references to a 1975 Michigan presentence investigation report regarding Pizzuto's conviction in that state for criminal sexual conduct. The 1986 Idaho report also contained statements given by Berta Herndon's husband and Del Herndon's mother.

Pizzuto was sentenced to a fourteen-year fixed term with no possibility of parole for grand theft, a fixed life term for robbery, and was sentenced to death for the murders of Del Herndon and Berta Herndon.

Following sentencing, Pizzuto filed his petition for post-conviction relief alleging numerous errors in the proceedings leading to his convictions and sentences. After conducting a hearing on the post-conviction petition, the district court found Pizzuto's arguments to be without merit and dismissed the petition.

Pizzuto now appeals his convictions and the denial of his motion for post-conviction relief alleging various errors committed by the trial court in violation of the United States and Idaho Constitutions.

## STANDARD ON REVIEW

■ The defendant has the burden of demonstrating error in the trial court. *State v. Lankford*, 113 Idaho 688, 747 P.2d 710 (1987); *State v. Wallace*, 98 Idaho 318, 563 P.2d 42 (1977). Error will not be presumed on appeal but must be affirmatively shown by the appellant. *State v. Lankford, id.; State v. Wallace, id.* It is with these standards and principles in mind that we review this case.

### A.

### TRIAL

I. *Evidence of Other Crimes or Bad Acts.*

■ Pizzuto asserts that he was denied a fair trial because the trial court allowed evidence of uncharged misconduct to be presented to the jury. Pizzuto argues that the objectionable evidence was admitted to prove bad character and to show that he acted in conformity with that character.

The trial court admitted testimony that Pizzuto had intended to rob Stephen Crawford, who was fishing near the Herndon cabin, immediately prior to the time the Herndon vehicle arrived at the scene. The trial court ruled that the evidence of this incident was admissible to show motive, intent, scheme or plan "so closely related to the Herndon's that proof of their involvement with Steven Crawford, tends to demonstrate the robbery of the Herndons."

The trial court also admitted evidence that subsequent to the Herndon murders Pizzuto approached Roger Bacon, threatened him with a weapon, told him that he was a "highwayman" and that he intended to steal his money and his car. Pizzuto then used Bacon's shoelaces to tie his hands behind his head, interlocking Bacon's fingers and tieing his two index fingers together. He then gagged Bacon and tied him to a tree. The trial court concluded that the circumstances of the Bacon incident closely paralleled the circumstances of the Herndon murders because Pizzuto had also advised one of the victims that he was a "highwayman" and had tied the victims' hands with shoelaces in a manner similar to the way Bacon's hands had been tied. The evidence relating to the Bacon incident was admitted as relevant to show motive, intent and common scheme or plan closely related to the Herndon murders. The trial court ruled that this evidence was highly probative and therefore negated any claim of prejudice which may result from its admission into evidence. Pizzuto contends on appeal that this evidence was only marginally relevant and was substantially more prejudicial than probative.

■ Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." I.R.E. 401; *Harkness v. City of Burley*, 110 Idaho 353, 715 P.2d 1283 (1986); *State v. Hocker*, 115 Idaho 544, 768 P.2d 807 (Ct.App.1989). Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. I.R.E. 403; *State v. Roach*, 109 Idaho 973, 712 P.2d 674 (Ct.App.1985). Generally, I.R.E. 404(b) forbids the introduction of other crimes, wrongs or acts if the purpose in doing so is to prove the character of the person in order to show that he acted in conformity therewith. *State v. Needs*, 99 Idaho 883, 591 P.2d 130 (1979). However, such acts may be admissible if relevant to prove motive, opportunity, intent, preparation, a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the

other, knowledge, identity, or absence of mistake or accident. I.R.E. 404(b); *State v. Wrenn,* 99 Idaho 506, 584 P.2d 1231 (1978); *State v. Walker,* 109 Idaho 356, 707 P.2d 467 (Ct.App.1985). Under certain circumstances evidence of prior crimes may be admissible when offered to prove identity of defendant as perpetrator of a crime with which he is charged. *State v. Hatton,* 95 Idaho 856, 522 P.2d 64 (1974). If the trial judge finds the evidence relevant to these similar issues, he or she must, exercising sound discretion, weigh the probative value of such evidence against any unfair prejudice it may cause to the defendant. *State v. Stuart,* 110 Idaho 163, 715 P.2d 833 (1986); *State v. Abel,* 104 Idaho 865, 664 P.2d 772 (1983); *State v. Sharp,* 101 Idaho 498, 616 P.2d 1034 (1980); *State v. Buzzard,* 110 Idaho 800, 718 P.2d 1238 (Ct.App.1986).

In the instant case, the uncharged misconduct evidence was not remote in time because all of the incidents happened within hours or days of the murders of the Herndons. The encounter with Crawford immediately prior to Pizzuto going to the Herndon cabin is relevant and probative to show Pizzuto's intent to rob and murder the Herndons. This evidence, along with evidence of the robbery of Bacon, is probative to show a pattern, plan, motive, intent, and common scheme or plan to rob and harm unsuspecting persons in the campground area. Likewise, Bacon's description of Pizzuto's robbery of him was very similar to Pizzuto's robbery of the Herndons. The evidence provided by Bacon was probative of Pizzuto's identity and we hold that the trial court did not abuse its discretion by admitting evidence of the similar uncharged conduct.

Pizzuto also asserts that Bacon's testimony should not have been admitted because his name was not included on the State's list of witnesses. By the State's failure to formally disclose Bacon as a potential witness until six days prior to trial, Pizzuto contends that he was deprived of the opportunity to adequately investigate Bacon's background and rebut his testimony. The trial court concluded that the State was not late in its disclosure because Bacon's statement had been previously provided in the State's first discovery response. We agree with the trial court that Pizzuto had adequate notice prior to trial that Bacon would be a potential witness. Even if the absence of Bacon's name from the witness list was late disclosure, delayed disclosure by the prosecution is not necessarily reversible error. *State v. Smoot,* 99 Idaho 855, 590 P.2d 1001 (1978). The test for reversible error is whether lateness of disclosure so prejudiced defendant's preparation or presentation of his defense that he was prevented from receiving his constitutionally guaranteed fair trial. I.C.R. 16(d); U.S.C.A. Const. Amend. 6; *State v. Olsen,* 103 Idaho 278, 647 P.2d 734 (1982).

In the instant case Pizzuto had knowledge of Bacon's statement through the discovery process well in advance of trial. Furthermore, the trial court granted a continuance to allow the defendant's expert witness to examine evidentiary materials connected with Bacon's testimony. Pizzuto has failed to show that he was unprepared to respond to or rebut Bacon's testimony. After carefully reviewing the record we find that no reversible error resulted from the absence of Bacon's name on the State's list of witnesses, particularly where this witness's name and statement was included in the State's first discovery response, and further because the defendant was granted a continuance to allow examination of evidentiary materials connected with Bacon's testimony. The record does not support Pizzuto's argument that the late disclosure prejudiced his defense to the extent he was prevented from receiving his constitutionally guaranteed fair trial.

II. *Late Disclosure of the Jury Panel.*

Pizzuto asserts that as a result of a late disclosure of the jury panel, he did not have an adequate opportunity to investigate the panel as a whole, nor was he able to adequately investigate the qualifications of each individual juror prior to jury selection. Pizzuto argues that late disclosure of the jury panel denied him his right to a fair trial and to due process of law as guaranteed by the fifth and fourteenth amend-

ments of the United States Constitution and similar guarantees and protections under the Idaho Constitution. Specifically, Pizzuto asserts that the trial court should have granted a continuance to allow him additional time to acquire information concerning the potential jurors to permit the exercise of intelligent and informed preemptory challenges and challenges for cause. In denying the motion for continuance the trial court ruled:

I am permitting the individual voir dire in this matter and any questions you want answered that you think should be on the information list, I'll let you ask those questions, certainly within reason today.... We had this [jury panel list] delivered to us as soon as they selected the jury and we got it to you obviously as soon as we got it. I understand that you would like more time to perhaps investigate these people but I intend to permit a relatively liberal voir dire examination and I feel based on that fact you'll be able to select a jury that's fair and impartial without the need for continuing this matter at this time.

In support of his argument that late disclosure of the jury panel prejudiced him, Pizzuto cites 18 U.S.C. § 3432 and *Hamer v. United States*, 259 F.2d 274 (9th Cir. 1958), which require in certain cases, primarily treason and capital offenses, that a defendant must be furnished with a list of prospective jurors prior to trial. Pizzuto asserts that at least seven days is necessary to adequately review the jury panel to determine whether any challenges to the panel are appropriate. We disagree. The federal statute and authorities cited are inapplicable to cases brought in state court. Further, there is no authority cited to show that such advance disclosure is tantamount to a constitutional right. The trial judge gave Pizzuto the list of jurors as soon as it was made available, and thereafter allowed the parties to engage in liberal voir dire. We hold that Pizzuto's right to a fair trial was not violated nor was he prejudiced as a result of late delivery of the jury panel.

## III. *Prosecution's Closing Argument.*

Pizzuto asserts that he was denied a fair trial as a result of an improper closing argument by the prosecuting attorney. He argues that throughout closing argument the prosecutor injected his personal beliefs and opinions as to the truth or falsity of certain testimony and the guilt of the defendant. Pizzuto acknowledges that at no time did he object to the prosecutor's statements as being prejudicial nor did he request the trial court to direct the jury to disregard the statements. It is a well established principle, with the limited exception of "fundamental error," that error at trial must be properly objected to in order to merit review. *State v. Carter*, 103 Idaho 917, 655 P.2d 434 (1981); *State v. LePage*, 102 Idaho 387, 630 P.2d 674 (1981); *State v. Garcia*, 100 Idaho 108, 594 P.2d 146 (1979); *State v. White*, 97 Idaho 708, 551 P.2d 1344, *cert. denied*, 429 U.S. 842, 97 S.Ct. 118, 50 L.Ed.2d 111 (1976); *State v. Wright*, 97 Idaho 229, 542 P.2d 63 (1975).

In *State v. Garcia*, 100 Idaho 108, 594 P.2d 146 (1979), this Court held that improper closing argument by the prosecuting attorney constituted "fundamental error" and was therefore reviewable on appeal notwithstanding the fact that no objection had been made by defense counsel during trial. *See State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981) (the gravity of a sentence of death and the infrequency with which it is imposed outweighs any rationale that might be proposed to justify refusal to consider error not objected to below); *State v. White*, 97 Idaho 708, 551 P.2d 1344 (1976) (fundamental error will be reviewed on appeal even if no adequate objection is interposed at trial).

As a general rule, counsel for both sides have traditionally been afforded considerable latitude in their arguments to the jury and have the right to discuss fully, from their respective standpoints, the evidence and the inferences and deductions arising therefrom. *State v. Estes*, 111 Idaho 423, 725 P.2d 128 (1986); *State v. Sistrunk*, 98 Idaho 629, 570 P.2d 866 (1977); *State v. Gilbert*, 65 Idaho 210, 142 P.2d 584 (1943). Although it is the function of the

trial counsel to point out discrepancies and conflicts in testimony, it is for the jury to determine credibility of witnesses and resolve any conflicts. *See generally State v. Erwin*, 98 Idaho 736, 572 P.2d 170 (1977); *State v. Brown*, 94 Idaho 352, 487 P.2d 946 (1971), *overruled on other grounds*. Both this Court and the United States Supreme Court have long condemned the injection of personal opinion in closing argument by a prosecuting attorney in a criminal case. *United States v. Young*, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985); *State v. Garcia*, 100 Idaho 108, 594 P.2d 146 (1979); *State v. Rosencrantz*, 110 Idaho 124, 714 P.2d 93 (Ct.App.1986).

In *State v. Garcia*, 100 Idaho 108, 594 P.2d 146 (1979), the prosecutor made the following comments in his closing argument:

Prosecutor:

Q. Now after Mr. Garcia has been caught in this rather apparent contradiction, *the lie*, he didn't have the beer pitcher. [referring to testimony that the police found Garcia holding a beer pitcher with money inside.] (Emphasis added.)

Prosecutor:

Q. If on the other hand, one of the possible conclusions could appear to you to be reasonable and the other to be unreasonable, it would be your duty to adhere to the reasonable deduction and to reject the unreasonable—*ladies and gentlemen, I don't believe Mr. Garcia's story, too many coincidences, too many slips and slides around the facts.* (Emphasis original.)

▉▉▉ In reference to comments similar to those quoted above, this Court has previously held that it was error for the prosecutor to express a personal belief or opinion as to the credibility of a witness in a murder prosecution.[1] However, in *Garcia* the error was deemed harmless in light of

overwhelming and conclusive evidence of the defendant's guilt.

In the instant case, Pizzuto claims that throughout the prosecuting attorney's closing argument his personal beliefs and opinions as to the truth or falsity of certain witnesses' testimony and as to the guilt of the defendant were injected. Pizzuto cites the following portion of the prosecutor's closing argument as being particularly prejudicial:

And that Angie Pizzuto had been accepting money over the months from old Mr. Del Herndon, "and continues to do so," I remember those words very distinctly. Ladies and gentlemen, that just wasn't the case and I think you saw that it wasn't. I think you saw Mr. Del Herndon, as a very generous thoughtful and caring man ...

I submit to you, ladies and gentlemen, the testimony of Toni Pizzuto in this case was simply not credible. The testimony of Angie Pizzuto, sad as it was, was very credible, and very believable. And I don't care if she is a prostitute, or not. I don't think she is, and I found it incredible that the defense would try to try this case by innuendo rather than on the facts.

Certainly, ladies and gentlemen, were it not for the fact that Del Dean Herndon was already unconscious making snorting sounds snoring sounds of an irregular nature, in the cabin, helpless, would Jim Rice have gone in there and shot him? I don't think so, I don't think so, ladies and gentlemen.

I don't think you are going to have any problem with the rest of these charges either, because I think the case is clear, I think you know it.

You can convict or acquit on any or all of the charges. In other words, I'm not suggesting you do, but in other words, you could find the defendant not guilty

---

1. A prosecuting attorney may express an opinion in argument as to the truth or falsity of testimony or the guilt of the defendant when such opinion is based upon the evidence. *People v. McGill*, 190 Colo. 443, 548 P.2d 600 (1976); *State v. McKeehan*, 91 Idaho 808, 430 P.2d 886 (1967). However, when such a comment is contemplated the prosecutor should exercise caution to avoid interjecting his personal belief and should explicitly state that the opinion is based solely on inferences from evidence presented at trial. (Footnote cited from *Garcia*.)

on count one, I don't know how you could conceivably find the defendant not guilty on count one, but guilty on count three, for example.

Showing off, Mr. Macho, here is the prize. Gerry Pizzuto, or Gerry Gilbertson, as he was known then, holding Del Dean Herndon's own gun, showing off. "Look at me, I'm a big man, I killed somebody." Its disgusting, absolutely disgusting.

And he tells her, he brags to her—its beyond my comprehension, I don't understand folks—he brags to her about killing a man and a woman in Idaho, and he embellishes it, he says, "we had the man tied up to a tree." I don't know, maybe he got mixed up with Roger Bacon.

"... I didn't do it, I came upon this cabin and Rice and Odom were killing those people and I freaked out, I ran into the woods and had a seizure." Come on, that doesn't make sense.

He also told them something that just strikes me as insane, also told them that Berta Herndon was laughing, she thought it was funny, *I think that is another embellishment* on Gerry Pizzuto's part, I don't think Berta Herndon was laughing.

*I didn't believe every word he said, I think he shaded his testimony to some degree.* I don't know whether Mr. Herndon was lying on the floor of the cabin, if due to the nature of that cabin his head was tipped forward at 45 angle.

I think that Rice, Odom knew where Gerry was going when he took off up the road to go hunting, to go get some meat. I don't know if that's true, but I think that the essence of what they told you is true, and I think you know it. (Emphasis added.)

Based on our decision in *Garcia*, we hold that the underlined portions of the quoted argument of the prosecutor were improper statements of personal belief or opinion. However, as in *Garcia*, the relevant and critical issue is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process. *Darden v. Wain-wright*, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986); *Donnelly v. De Christoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *see also State v. Missamore*, 114 Idaho 879, 761 P.2d 1231 (Ct. App.1988) (fundamental error requiring reversal of a conviction will only be found if the comments of the prosecuting attorney were so egregious and inflammatory that any prejudice arising from them could not have been remedied by a ruling from the trial court informing the jury that the comments should be disregarded.) I.C.R. 52 provides that "[a]ny error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." In applying the harmless error rule, this Court has held that where the admissible evidence provides, beyond a reasonable doubt, "overwhelming and conclusive" proof of defendant's guilt, the admission of tainted evidence will be held to be harmless. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *State v. LePage*, 102 Idaho 387, 630 P.2d 674, *cert. denied*, 454 U.S. 1057, 102 S.Ct. 606, 70 L.Ed.2d 595 (1981).

We have carefully reviewed the trial record and find that the evidence presented at trial clearly demonstrates that the defendant was responsible for the Herndon murders. As this Court held in *Garcia*, we deem the prosecutor's statements harmless error in light of overwhelming and conclusive evidence of Pizzuto's guilt in the murder of Berta Herndon and Delbert Herndon.

## IV. *Admission of Photographs into Evidence at Trial.*

Over Pizzuto's objection, the trial court admitted various photographs relating to the charged crimes. The defendant asserts that the trial court particularly abused its discretion in admitting four of these photographs because they were highly prejudicial and unnecessary to illustrate the testimony of the pathologist who conducted the autopsies on the victims. Pizzuto asserts that admission of the photographs was primarily designed to inflame

the jury, and therefore claims he is entitled to a new trial.

The four photographs at issue showed a wire and shoestring that had been placed around the wrists of one of the victims, the battered face and upper body of Berta Herndon and the back of Delbert Herndon's head showing a gunshot wound.

Where allegedly inflammatory evidence is relevant and material as to an issue of fact, the trial court must determine whether the possible prejudice that might inure to the defendant by admission of the evidence is outweighed by its probative value. I.R.E. 403; *State v. Enno*, 119 Idaho 392, 807 P.2d 610 (1991); *State v. Windsor*, 110 Idaho 410, 716 P.2d 1182 (1985), *cert. denied*, 479 U.S. 964, 107 S.Ct. 463, 93 L.Ed.2d 408 (1986); *State v. Scroggins*, 110 Idaho 380, 716 P.2d 1152 (1985); *State v. Beam*, 109 Idaho 616, 710 P.2d 526 (1985); *State v. Wilson*, 93 Idaho 194, 457 P.2d 433 (1969); *State v. Beason*, 95 Idaho 267, 506 P.2d 1340 (1973); *State v. Martinez*, 92 Idaho 183, 439 P.2d 691, *cert. denied*, 393 U.S. 945, 89 S.Ct. 317, 21 L.Ed.2d 283 (1968). The determination of whether or not to admit evidence challenged on the ground that it is more prejudicial than probative is clearly within the trial court's discretion. *State v. Scroggins*, 110 Idaho 380, 716 P.2d 1152 (1985); *State v. Wilson*, 93 Idaho 194, 457 P.2d 433 (1969). "The trial court has the discretion to admit into evidence photographs of the victim in a homicide case as an aid to the jury in arriving at a fair understanding of the evidence, as proof of the corpus delecti, the extent of injury, the condition of the body, and for their bearing on the question of the degree and atrociousness of the crime." *State v. Beam*, 109 Idaho 616, 620, 710 P.2d 526, 530 (1985); *State v. Martinez*, 92 Idaho 183, 439 P.2d 691, *cert. denied*, 393 U.S. 945, 89 S.Ct. 317, 21 L.Ed.2d 283 (1968). The fact that the photographs depict the actual body of the victim and the wounds inflicted on the victim and may tend to excite the emotions of the jury is not a basis for excluding them. *State v. Beam*, 109 Idaho 616, 710 P.2d 526 (1985). Whether to admit allegedly inflammatory evidence is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion. *State v. Windsor*, 110 Idaho 410, 716 P.2d 1182 (1985), *cert. denied*, 479 U.S. 964, 107 S.Ct. 463, 93 L.Ed.2d 408 (1986); *State v. Abel*, 104 Idaho 865, 664 P.2d 772 (1983).

In *State v. Scroggins*, 110 Idaho 380, 716 P.2d 1152 (1985), we upheld the admission of photographs which depicted bruises and abrasions on the victim's body. Although the photographs were not used by the pathologist to assist him in describing his observations, we held that the trial court did not abuse its discretion in admitting the photographs.

In *State v. Beam*, 109 Idaho 616, 710 P.2d 526 (1985), this Court held:

The trial court has the discretion to admit into evidence photographs of the victim in a homicide case as an aid to the jury in arriving at a fair understanding of the evidence, as proof of the *corpus delecti*, the extent of the injury, the condition of the body, and for their bearing on the question of the degree and atrociousness of the crime. The fact that the photographs depict the actual body of the victim and the wounds inflicted on her and may tend to excite the emotions of the jury is not a basis for excluding them. *State v. Caudill*, 109 Idaho 222, 706 P.2d 456 (1985); *State v. Bean*, 109 Idaho 231, 706 P.2d 1342 (1985).

A defendant cannot complain that a jury's emotions were excited by evidence which depicts for the jury accurately that a crime was committed and the method, fashion and atrociousness by which the crime was committed.

*Id.* at 109 Idaho 620–21, 710 P.2d at 530–31.

We have reviewed the photographs in question and hold that it was not an abuse of discretion for the trial court to admit the photographs. The photographs were relevant as an aide to the jury in arriving at a fair understanding of the evidence, the extent of the victims' injuries, condition of the bodies, and bearing on the question of the degree and atrociousness of the crimes. Accordingly, we hold that their admission was not error.

## B.

## SENTENCING ISSUES

### V. Double Jeopardy.

■ Pizzuto was tried on a six-count information which alleged two counts of first degree premeditated murder, two counts of first degree felony murder, robbery, and grand theft. Pizzuto asserts that his conviction for the crime of robbery and also felony murder, where the basis for the felony murder charge was the crime of robbery, results in double jeopardy in violation of the fifth amendment of the United States Constitution and art. 1, § 13 of the Idaho Constitution. He further asserts that the robbery conviction may also be considered a lesser included offense of the premeditated first degree murder convictions. The latter argument advanced by Pizzuto is premised on the fact that the jury was given an instruction that one of the material elements of first degree premeditated murder is that the victim be killed with malice aforethought and that malice may be shown from the fact that an unlawful killing took place during the perpetration of the crime of robbery. Thus, according to Pizzuto, the robbery also supplied a necessary element of the first degree premeditated murder conviction. As such, Pizzuto asserts that his robbery conviction should be dismissed because his constitutional right not to be put twice in jeopardy for the same offense has been violated and that the multiple convictions violate I.C. § 18-301.[2]

■ The prohibition against double jeopardy has been held to mean that a defendant may not be convicted of both a greater and lesser included offense. Brown v. Ohio, 432 U.S. 161, 164, 97 S.Ct. 2221, 2226, 53 L.Ed.2d 187, 196 (1977); Sivak v. State, 112 Idaho 197, 731 P.2d 192

(1986); State v. Thompson, 101 Idaho 430, 614 P.2d 970 (1980); State v. McCormick, 100 Idaho 111, 594 P.2d 149 (1979). The double jeopardy clause protects against a second prosecution for the same offense after acquittal, protects against a second prosecution for the same offense after conviction, and protects against multiple punishments for the same offense. Brown v. Ohio, 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977).

In State v. Anderson, 82 Idaho 293, 352 P.2d 972 (1960), this Court held an offense is an included offense if it is alleged in the information as a means or element of the commission of a higher offense. This definition of lesser included offenses has been referred to as the "indictment" or "pleading" theory and expands the traditional "statutory" theory[3] of a lesser included offense for the purpose of determining whether there is double jeopardy. State v. Thompson, 101 Idaho 430, 614 P.2d 970 (1980).

In the instant case, the criminal information charged Pizzuto with two counts of first degree premeditated murder, in violation of I.C. §§ 18-4001 and 18-4003(a), two counts of first degree felony murder in violation of I.C. §§ 18-4001 and 18-4003(d), one count of robbery in violation of I.C. § 18-6501 and one count of grand theft in violation of I.C. § 18-2407(1)(b)(1). The jury returned guilty verdicts on all four charges of murder in the first degree, one count of robbery and one count of grand theft. The trial court sentenced Pizzuto to a fourteen-year fixed term with no possibility of parole for grand theft, a fixed life term for robbery, and two sentences of death, one for murder in the first degree for the unlawful killing of Del Herndon and one for murder in the first degree for the unlawful killing of Berta Herndon.

---

**2. 18-301. Acts punishable in different ways— Double jeopardy.**—An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; an acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under any other.

**3.** As explained in State v. Thompson, 101 Idaho 430, 614 P.2d 970 (1980), under the "statutory theory", one offense is not considered a lesser included of another unless it is necessarily so under the statutory definition of the crime. Larson v. United States, 296 F.2d 80 (10th Cir. 1961); Little v. State, 303 A.2d 456 (Me.1973).

Pizzuto argues that like the robbery charge in *Sivak v. State,* 112 Idaho 197, 731 P.2d 192 (1986), his robbery conviction, which formed the basis for the felony murder charge under I.C. § 18–4003(d), should merge with the first degree murder charge as being a lesser included offense. Pizzuto argues that the robbery conviction should also be deemed a lesser included offense of the premeditated first degree murder conviction because jury Instruction No. 19 stated that *malice* may be shown from the fact that an unlawful killing took place during the perpetration or attempted perpetration of the crime of robbery.

Idaho Code § 18–4003 defines degrees of murder and provides in pertinent part:

**18–4003. Degrees of Murder.**—(a) All murder which is perpetrated ... by any kind of wilful, deliberate and premeditated killing is murder of the first degree.

. . . .

(d) Any murder committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, kidnapping or mayhem is murder of the first degree.

In *Sivak v. State,* 112 Idaho 197, 731 P.2d 192 (1986), the defendant was charged and convicted of both robbery and felony murder, the murder being committed in the course of the robbery. On appeal, Sivak raised the issue of double jeopardy by arguing that his conviction on the counts of both felony murder and robbery were in violation of I.C. §18–301 and also violated his constitutional right not to be twice put in jeopardy for the same offense. In *Sivak,* this Court applied the test stated in *State v. McCormick,* 100 Idaho 111, 594 P.2d 149 (1979), to determine if Sivak's constitutional rights had been violated. This test is as follows:

An offense will be deemed to be a lesser included offense of another, greater offense, if all the elements required to sustain a conviction of the lesser included offense are included within the elements needed to sustain a conviction of the greater offense. Of course, the greater offense may require proof of additional elements in order to sustain a conviction.

*Sivak v. State,* 112 Idaho 197, 211, 731 P.2d 192, 206 (1986). *State v. McCormick,* 100 Idaho 111, 594 P.2d 149 (1979). Applying the foregoing test, this Court held under the particular facts in *Sivak,* the robbery was a lesser included offense of felony murder because all the elements required to sustain a conviction of robbery were also within the elements needed to sustain a conviction of felony murder. Therefore, in *Sivak,* the robbery conviction merged as a lesser included offense of the felony murder conviction. *Sivak v. State,* 112 Idaho 197, 211, 731 P.2d 192, 206 (1987). However, as this Court stated in *Sivak,* the issue of whether a charged offense is a lesser included offense of another charged offense is analyzed in reference to the facts of each case. *Id.* at 211, 731 P.2d at 206.

■ In *Sivak,* the robbery conviction was held to violate the defendant's constitutional rights prohibiting double jeopardy because had the robbery not been committed, the State would have received only a second degree murder conviction against Sivak, and with it a much lighter punishment. However, because of the robbery, the State sought and received a first degree murder conviction against Sivak carrying a more severe penalty. In *Sivak,* the murder occurred in the course of a robbery, however it was held there was no specific intent to commit murder. Hence, without the robbery, Sivak could not have been convicted of first degree murder. In the instant case, however, not only was the murder committed in the course of a robbery, but there was substantial evidence showing specific intent to cause both deaths. Hence, even if the robbery had not occurred, there is substantial evidence showing that the Herndon murders were willful, deliberate and premeditated. Thus, the robbery did not provide the means of convicting Pizzuto of premeditated first degree murder and therefore the robbery is not a lesser included offense of that crime. However, under the facts of this particular case, the robbery is a lesser included offense of felony murder and must be merged with that conviction. As we said in *Sivak v. State:*

Idaho, however, seems to have adopted the broader indictment or pleading theory. *Id.* at 433–434, 614 P.2d at 973–74. This theory holds "that an offense is an included offense if it is alleged in the information as a means or element of the commission of the higher offense." *State v. Anderson,* 82 Idaho 293, 301, 352 P.2d 972, 977 (1960). In other words, the issue is analyzed in reference to the facts of each case. In this case, Sivak was charged with robbery which was also the basis for the charge of felony murder. Applying the test set forth in *McCormick,* it is clear that all the elements required to sustain a conviction of robbery were also within the elements needed to sustain a conviction of felony murder. Thus, under these circumstances, robbery is a lesser included offense of felony-murder and, therefore, the robbery conviction merges as a lesser included offense of the felony murder conviction.

Our conclusion does not go unsupported. The United States Supreme Court, in *Whalen v. United States,* 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980), found that a rape conviction merged with a felony murder conviction because "[a] conviction for killing in the course of rape cannot be had without proving all of the elements of the offense of rape." *Id.,* at 694, 100 S.Ct. at 1439, 63 L.Ed.2d at 725.

112 Idaho at 211, 731 P.2d at 206. Accordingly, under these factual circumstances, robbery is a lesser included offense of felony murder and, therefore, the sentence for robbery merges as a lesser included offense of felony murder and must be vacated.

■ Pizzuto also contends that the robbery conviction should be deemed a lesser included offense of the premeditated first degree murder conviction for the further reason that jury Instruction No. 19 stated that *malice* may be shown from the fact that an unlawful killing took place during the perpetration or attempted perpetration of the crime of robbery.

Idaho Code § 18–4002 defines both express and implied malice and states:

**I.C. 18–4002. Express and implied malice.**—Such malice may be express or implied. It is express when there is manifested a deliberate intention unlawfully to take away the life of a fellow creature. It is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.

The jury concluded, and our review of the record confirms, that the evidence showed Pizzuto had specific intent to murder the Herndons. As Pizzuto walked toward the Herndon cabin, rifle in hand, he commented to his associates that he was going "hunting." From prior conversations with Pizzuto, his associates interpreted his "hunting" comment to mean that he intended to rob and murder the Herndons. Furthermore, the deliberate and wilful act of bludgeoning the Herndons with a hammer supports the convictions of premeditated murder. The robbery did not provide the sole means of convicting Pizzuto of first degree premeditated murder. Rather, the bludgeonings were the basis for the murder convictions. Therefore, we hold there is no double jeopardy under the circumstances presented in the instant case.

Pizzuto also claims that the conviction for both robbery and felony murder violates I.C. § 18–301, which provides if a single act creates liability under two criminal statutes the defendant can only be punished under one statute. *State v. Horn,* 101 Idaho 192, 610 P.2d 551 (1980). Inasmuch as we have merged the sentence imposed for the robbery with the felony murder, it is not necessary that we address Pizzuto's claim that conviction for both robbery and felony murder violates the provisions of I.C. § 18–301.

■ Pizzuto also asserts that he has been sentenced twice for the murder of Berta Herndon and twice for the murder of Del Herndon in violation of I.C. § 18–301. We disagree.

Pizzuto was convicted of murdering both Mrs. Herndon and Mr. Herndon. The jury found that in each case the murder was

murder of the first degree. The jury reached this result by finding that the murder of each of the victims was both a felony murder and a premeditated murder. This does not mean that there were two different murders of each victim, nor does it mean that Pizzuto was sentenced to death twice for killing each victim. The trial court's findings considering the death penalty make it clear that Pizzuto was sentenced to death only once for killing each of the victims. Therefore, there was no violation of I.C. § 18–301.

## VI. Consideration of a 1975 Michigan Presentencing Report.

██ As required by I.C. § 19–2515(d), the trial court ordered a presentence investigation prior to the sentencing hearing. As part of the presentence investigation, a written report was prepared which included information relating to Pizzuto's prior conviction in the state of Michigan. Pizzuto asserts that the trial court erred in admitting testimony concerning a presentence investigation report prepared in 1975 by Michael Berro, an employee of the Michigan Department of Corrections. Berro's testimony in the instant case pertained to statements made by Pizzuto in the course of an interview with him for the purpose of preparing the 1975 Michigan presentence investigation report for Pizzuto's conviction of criminal sexual conduct. Pizzuto asserts at the time he was interviewed by Berro for the purpose of preparing the 1975 Michigan presentence report that he was not given his *Miranda* rights[4] and accordingly it was error to allow this evidence.

In *State v. Paz*, 118 Idaho 542, 798 P.2d 1 (1990), the defendant asserted as error the fact that the presentence report used at his Idaho sentencing hearing contained information from a prior manslaughter conviction in Oregon. The data contained in the Idaho presentence report contained a general description of statements made by

Paz to police concerning the crime committed in Oregon. In *State v. Paz*, we held that the statements from the Oregon presentence report were admissible hearsay because the records were certified as official Oregon state records. Furthermore, we held that the Oregon presentence report was appropriate to provide the trial court with a full perspective of the person on whom it was to impose sentence.

In the instant case, Berro's testimony concerning the 1975 Michigan presentence report is similar in its content to the presentence report admitted in *Paz*. However, Pizzuto challenges admissibility not because it is hearsay, but because he claims that his fifth amendment privilege against self-incrimination was violated at the time the statements were made. Pizzuto asserts that at the time he made the statements to the Michigan presentence investigator, he was not advised that his statements could be used against him in *future* criminal proceedings, therefore his rights against self-incrimination were violated. In support of this contention, Pizzuto relies primarily on *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), in which the United States Supreme Court held that during a pretrial psychiatric examination to determine competency to stand trial, a person charged with murder is entitled to be advised that he has a right to remain silent and anything he says in that medical evaluation may be used against him following conviction at the sentencing hearing. We decline to extend the *Estelle v. Smith* principle to the facts of the instant case which are easily distinguishable.

Pizzuto also relies on *Jones v. Cardwell*, 686 F.2d 754 (9th Cir.1982), in which the Ninth Circuit Court of Appeals held that *Estelle* supports application of the fifth amendment privilege to sentencing procedures. In *Jones v. Cardwell*, the defendant was convicted of first degree burglary and rape. After conviction, but before sen-

---

**4.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), which held that unless fully effective means are devised to inform accused person of the right to silence and to assure continuous opportunity to exercise it,

person must, before any questioning, be warned that he has right to remain silent, that any statement he does make may be used as evidence against him, and that he has right to presence of attorney, retained or appointed.

tencing, a state probation officer interviewed the defendant on several occasions and during one of these sessions the defendant confessed to the commission of numerous other crimes. At sentencing, the trial judge improperly relied on the confessions in imposing sentence.

In the instant case Pizzuto challenges Berro's testimony in which he recited Pizzuto's version of the events which were the basis of his Michigan conviction for criminal sexual conduct. Pizzuto also objects to the following testimony:

Yes, when I was interviewing him in the County jail and I think you will find it in the presentence investigation I prepared, he made it very clear that he—he boasted about being shirt tail relation of the Mafia or his father was in the Mafia and he had connections and things like that. He stated that he was keeping a list of everybody who had done him wrong and when he got out of prison he was going to come out and take care of them.

■ A defendant's prior criminal activity may be considered by the trial judge in imposing sentence. *State v. Couch,* 103 Idaho 496, 650 P.2d 638 (1982). Furthermore, this Court has held that the sentencing court is free to consider the results of a prehearing investigation if the information contained in the report is reliable. *State v. Creech,* 105 Idaho 362, 670 P.2d 463 (1983); *see State v. Yoelin,* 94 Idaho 791, 498 P.2d 1264 (1972). To ensure reliability, the defendant must be afforded the opportunity to present favorable evidence, to examine all materials contained in the presentence report, and to explain and rebut adverse evidence. I.C. §§ 19–2515, 19–2516; *State v. Creech,* 105 Idaho 362, 670 P.2d 463, *cert. denied,* 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 722 (1984); *State v. Johnson,* 101 Idaho 581, 618 P.2d 759 (1980). Unlike the defendant in *Jones v. Cardwell,* 686 F.2d 754 (9th Cir.1982), Pizzuto made no

statements to Berro which incriminated him in any other crime. We do not find that Pizzuto's fifth amendment rights were violated by the admission of Berro's testimony or by the trial court considering the 1986 Idaho presentence investigation report in this instant case which contains references to the 1975 Michigan report.

After carefully reviewing the record we hold that the trial court could consider the testimony of Berro as well as the contents of the 1986 presentence investigation report. The record demonstrates that counsel for Pizzuto had ample opportunity to examine the report and to explain and rebut its contents. We therefore hold that Berro's testimony and the 1986 presentence investigation report were admissible at Pizzuto's sentencing hearing.

### VII. *Victim Impact Statement in Presentencing Report.*

■ Pizzuto asserts that his rights guaranteed by the United States Constitution and the Idaho Constitution were violated by the trial court considering or having access to victim impact statements when imposing the death penalty. At the time of sentencing the defense did not make a specific objection to either the contents of the presentence investigation report or to the testimony at sentencing. In *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981), this Court was faced with the issue of whether the defendant's failure to object to the use of the preliminary hearing record at the sentencing hearing precluded appellate review.[5] This Court held in *Osborn* that the general rule which limits review on appeal if error is not objected to at the trial court is not controlling since I.C. § 19–2827 mandates that the Court examine the procedure followed in imposing the death penalty regardless of whether an appeal is taken. Under the circumstances presented here we are free to review the issue of the

5. *State v. Lankford,* 113 Idaho 688, 747 P.2d 710 (1987) (with limited exceptions error at trial must be properly objected to and preserved to merit review); *State v. Garcia,* 100 Idaho 108, 594 P.2d 146 (1979) (with the limited exception of cases involving "fundamental error," error at trial must be properly objected to in order to

merit review); *State v. White,* 97 Idaho 708, 551 P.2d 1344, *cert. denied,* 429 U.S. 842, 97 S.Ct. 118, 50 L.Ed.2d 111 (1976) (the exception to the general rule is that this Court will review "fundamental error" on appeal even when no adequate objection has been interposed at trial).

use of victim impact statements at time of sentencing regardless of whether or not an objection was made at the trial court level.

The 1986 Idaho presentence investigation report submitted at Pizzuto's sentencing contained comments from the immediate families of the Herndons. The report states:

The mother of Del Herndon was contacted in Nebraska. She states, "I can't tell you to kill them because I'm a God fearing woman. But they should never be let loose. Those mean men have hurt our family so much." Her sons have come to Grangeville for the proceedings. She was not able to as she had a leg amputated. "I couldn't even attend Del's burial because I was in the hospital." The family of Del Herndon did not have the "thousands of dollars it cost to have my sons's body shipped home." His brother, Joe Herndon, states, "Today Del would have been 36 years old and right now he is laying in the ground in the wood and steel box they shipped him in, its not the way we wanted it but that's just the way it's happened. He is laying in an unmarked grave, he doesn't even have a headstone." Del Herndon had been a long distance truck driver who loved Idaho. He saved his money and studied how to pan gold and bought himself a mining claim. The last time his mother saw him was approximately one month before he was killed.

Del Herndon, Berta Herndon's husband, states, "My wife was murdered, you know that don't you? When they murdered Berta they took my life away too. If I had my way Pizzuto would get death by firing squad, Rice would get the life sentences consecutively and Odom would get two consecutive life sentences. And I don't agree with the plea bargaining on the Odom's. That's not right. That wife of Odom's is tough. I watched her and she is tougher than he is. Don't let her loose!" He indicates he has not received his wife's belongings. "I know everything she had in that overnight case." He then went on to describe her jewelry that has not been found. He believes Lene Odom has the rings. "I realize

nothing can help my wife but maybe we can protect others from it happening to them."

. . . .

The victim's families indicate that it has cost them "thousands and thousands of dollars" to return the victim's bodies home, bury their loved ones and attend the various court proceedings. They would like the victim's property returned as soon as possible.

At the sentencing hearing, the State also produced testimony from the husband of Berta Herndon and the uncle of Del Herndon. His testimony was as follows:

Q. Okay, I want you to tell the court Mr. Herndon, how the murder of your nephew and your wife has affected your life? If you can put it in words?

A. Well, to sum it all into one thing, it destroyed it. It took the best wife I believe any man every had, we weren't only man and wife, we were good friends, and that's more important than anything else in my book. She was a good woman, big hearted and in all our years of married life we never had one fight and that wasn't because we ignored each other, that's just the way it was.

Q. What about your nephew, Del; what kind of guy was he?

A. Well, he as a long-haul truck driver, he would drive from coast to coast, Canada to Mexico.

Q. Okay, he stopped in to see you from time to time and visited you for extended periods, didn't he?

A. Yes, one time he lived with us for a year and a half. He was out of work, he had been injured, his truck tipped over with him and we took care of him that way.

Q. Was he a comfort to you just being a relative and just being a friend?

A. Yes.

Q. You miss them both don't you?

A. Yes I do.

Q. Thank you Mr. Herndon. Do you have anything else you would like to say to the court?

A. Yes. I hope it never happens to anyone else.

In *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), the United States Supreme Court held that the eighth amendment prohibited a capital sentencing jury from considering victim impact statements because such statements were not relevant to the sentencing issues of the defendant's character and the nature of the offence. Specifically, the Supreme Court held:

> The VIS in this case provided the jury with two types of information. First, it described the personal characteristics of the victims and the emotional impact of the crime on the family. Second, it set forth the family member's opinions and characterizations of the crimes and the defendant. For the reasons stated below, we find that this information is irrelevant to a capital sentencing decision, and that its admission creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner.

482 U.S. at 500, 107 S.Ct. at 2533, 96 L.Ed.2d at 448.

 Relying on *Booth v. Maryland,* this Court has previously held that the portion of the death penalty statute which permits victim impact statements to be considered in the sentencing phase of a murder prosecution was unconstitutional and in violation of the eighth amendment to the United States Constitution. *State v. Sivak,* 119 Idaho 320, 806 P.2d 413 (1990); *State v. Paz,* 118 Idaho 542, 798 P.2d 1 (1990); *State v. Charboneau,* 116 Idaho 129, 774 P.2d 299 (1989). In the instant case, the statements made by family members and included in the presentence investigation report and the oral comments from Berta Herndon's husband at the sentencing hearing meet the definition of a victim impact statement as set out by the United States Supreme Court in *Booth v. Maryland.* We reaffirm our position that such statements may not be given orally at sentencing hearings or included in presentence investigation reports or considered by the trial court. *State v. Sivak,* 119 Idaho 320, 806 P.2d 413 (1990); *State v. Paz,* 118 Idaho 542, 798 P.2d 1 (1990); *State v. Charboneau,* 116 Idaho 129, 774 P.2d 299 (1989). In *Paz,* we stated that consideration of such statements at sentencing constitutes error, and that victim impact statements should not be included in a presentence investigation report. Hence, the inclusion of the victim impact statements in the presentence report and by oral testimony in the instant case is clearly error. However, the United States Supreme Court has held that some constitutional errors, if harmless, do not require automatic reversal of the conviction. *Satterwhite v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988); *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[6] The standard for determining whether error is harmless is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction, *Fahy v. Connecticut,* 375 U.S. 85, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963), and that the court must be able to declare a belief that it was harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *see also,* I.C.R. 52; *State v. Sharp,* 101 Idaho 498, 616 P.2d 1034 (1980) (to hold error harmless, the supreme court must declare belief, beyond a reasonable doubt, that there was no reasonable possibility that such evidence complained of contributed to conviction).

In *Satterwhite v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988), the issue presented to the Supreme Court pertained to a violation of the defendant's sixth amendment right to counsel in a capital case. The Court held that a sixth amendment violation which did not taint

---

**6.** The Supreme Court in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), cites to cases which have held that certain constitutional rights are so basic to a fair trial that their infraction can never be treated as harmless error. *See, e.g., Payne v. Arkansas,* 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975 (1958) (coerced confession); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (right to counsel); *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (impartial judge).

the proceeding as a whole did not require automatic reversal. Instead, the court adopted a case by case analysis to determine whether the evidence in question might have affected the jury in the sentencing phase of a capital trial. Applying the harmless error rule to the admission of victim impact statements at sentencing hearings, this Court in *State v. Paz,* 118 Idaho 542, 798 P.2d 1 (1990), reviewed the record of the sentencing hearing to examine the possibility that the judge may have been influenced by the inclusion of victim impact statements in imposing the death penalty. In *Paz,* the sentencing court outlined its reasons for imposing the death penalty, setting forth the mitigating and aggravating circumstances. The sentencing judge found the crime committed by Paz to be thought out and unprovoked, that Paz showed no remorse, that he had been involved in two previous crimes involving serious bodily injury, and that the primary reason for imposing the death penalty was for the protection of society because Paz had shown no indication of rehabilitation following his previous convictions for various crimes. Upon our review of the sentencing record in *Paz* stating the sentencing court's basis for imposing the death penalty, we were convinced beyond a reasonable doubt that the statement made by one of Paz's victims describing his reaction to the crime and his recommendation of the death penalty, did not influence the trial court in its decision to impose the death penalty. In *Paz,* we held that the error was harmless and did not require remand for resentencing.

In the instant case, five statutory aggravating circumstances were found by the trial court. In addition, the record indicates that the sentencing judge decided to impose the death penalty based upon Pizzuto's prior criminal record; that the murders were planned and calculated; that he expressed no remorse for murdering the Herndons; that Pizzuto had intimidated and threatened his jailers; that Pizzuto showed no signs of being able to be rehabilitated; that he joked and bragged about the murders; that he is a sociopath exhibiting "explosive features"; that he is a violent individual who receives pleasure from inflicting pain upon the helpless; that Pizzuto is unable to anticipate the consequences of his behavior and that his past pattern of living indicates that he will continue a life of violent criminal activity.

Unlike the victim impact statements admitted in both *Booth* and *Charboneau,*[7] the victim impact statements given by the Herndon relatives were brief and expressed typical feelings that one would assume a loved one would feel under the circumstances. The presentation of such statements to the sentencing judge would not give him an awareness of events or feelings of which he was not already aware. Furthermore, and more significantly, in light of *State v. Charboneau,* the sentencing judge in the instant case expressly stated in his written order on denial of the petition for post-conviction relief, that he had not considered these statements in reaching his decision to impose the death penalty. The record reflects that the trial judge's decision to impose the death penalty was based strictly on Pizzuto's past and present behavior and the circumstances surrounding the Herndon murders. We are convinced beyond a reasonable doubt that the sentencing judge imposed the death penalty without regard to the statements made by the Herndon family members. *See also Parker v. Dugger,* 537 So.2d 969 (Fla.1988) (although trial judge heard victim impact information contained in presentence investigation, evidence showed beyond a reasonable doubt

7. In *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), the victim impact statements were very detailed, describing how the victim's son and daughter had found the bodies of their parents, how the grandchildren had first heard of their grandparent's deaths from the television reports, and detailed accounts of the days following the deaths and the severe emotional impact felt by each member of the family. In *State v. Charboneau,* 116 Idaho 129, 774 P.2d 299 (1989), the victim impact statements were also detailed, discussing past assaults on the victim by Charboneau, threats he had made to various family members, the emotional changes that were observed in the victim's young daughter following the murder of her mother, and the deep fear of Charboneau felt by the victim's parents.

that death sentence for murder was not the product of victim impact information, but rather was the result of weighing the aggravating and mitigating factors); *People v. Jones*, 123 Ill.2d 387, 123 Ill.Dec. 944, 528 N.E.2d 648 (1988) (husband's statement at sentencing concerning loss of his wife not prejudicial given fact that matter was obvious.) We therefore hold that the admission of the victim impact statements at the time of sentencing was harmless error and the case need not be remanded for sentencing.

VIII. *Cumulative Effect of the Errors At Trial and Sentencing.*

 Pizzuto asserts that the errors which occurred at trial and at the sentencing hearing, when taken together and considered as a whole are of such magnitude as to have deprived him of a fair trial in violation of his right to due process as guaranteed by the fifth and fourteenth amendments of the United States Constitution and art. 1, § 13 of the Idaho Constitution. A defendant is entitled to a fair trial, but not a perfect trial. *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *State v. Enno*, 119 Idaho 392, 807 P.2d 610 (1991); *State v. Estes*, 111 Idaho 423, 725 P.2d 128 (1986).

The cumulative error doctrine refers to an accumulation of irregularities, each of which by itself might be harmless, but when aggregated, the errors show the absence of a fair trial. *State v. Campbell*, 104 Idaho 705, 662 P.2d 1149 (Ct.App.1983).

We have considered all of Pizzuto's contentions in this regard and are not persuaded that he was denied a fair trial. We find no prejudicial or reversible error at trial and affirm the conviction.

## C.

## CONSTITUTIONALITY OF IDAHO CAPITAL PUNISHMENT STATUTE

IX. *Prior Disclosure of Evidence Supporting Aggravating Circumstances.*

 Pizzuto contends that I.C. § 19–2515 violates the due process and the cruel and unusual punishment clauses of the United States Constitution because it does not require pretrial disclosure of the evidence on which the state plans to rely at sentencing.

 It is true that both the sentencing process and the trial must satisfy the requirements of the due process clause, *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977); *State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981), however the due process notice requirements at sentencing are not necessarily the same as those at trial. *Williams v. New York*, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337, *reh. denied*, 338 U.S. 841, 70 S.Ct. 34, 94 L.Ed. 514 (1949); *State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981).

In referring to the aggravation-mitigation hearing, I.C. § 19–2515(d) provides in pertinent part:

[s]hould any party present aggravating or mitigating evidence which has not previously been disclosed to the opposing party or parties, the court shall, upon request, adjourn the hearing until the party desiring to do so has had a reasonable opportunity to respond to such evidence.

In *State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981), this Court addressed essentially the same issue raised in this appeal wherein the defendant asserted that he was denied due process because he was not forewarned as to which aggravating circumstances the State sought to prove beyond a reasonable doubt at the sentencing hearing. In *Osborn*, this Court held:

The statute clearly sets forth that one of the listed aggravating circumstances must be proven beyond a reasonable doubt, and must outweigh any mitigating circumstances shown, prior to imposition of death. Generally, it is apparent that there will be no surprise under the facts of any given case as to what potential aggravating circumstances are involved. Both defense counsel and prosecution who have participated in the earlier preliminary hearing and trial will ordinarily

be well appraised and conversant with the facts and issues involved in the aggravation-mitigation hearing. We additionally note that the statute, in I.C. § 19–2515(d), provides that should any party present evidence not previously disclosed, the court upon request shall adjourn the hearing until the opponent has had a reasonable opportunity to respond.... Such protections are sufficient and we will not attach thereto a superfluous judicial requirement that the state formally notify a defendant of the particular aggravating circumstances upon which it will rely.

*Id.* at 413, 631 P.2d at 195.

■ In post-conviction proceedings, the burden is on the petitioner to establish a constitutional violation. *Sivak v. State,* 112 Idaho 197, 731 P.2d 192 (1986). Pizzuto has cited authority which supports his position. In *People v. Walker,* 41 Cal.3d 116, 222 Cal.Rptr. 169, 711 P.2d 465 (1985), the California court held that it was error to admit at sentencing defendant's alleged death threats when not disclosed to him prior to trial as required under a California statute. Idaho has no such statutory requirement, and there is no precedent mandating such disclosure absent statutory directives.

■ The sentencing judge is entitled to consider a wide range of relevant evidence in determining an appropriate sentence. *Roberts v. United States,* 445 U.S. 552, 100 S.Ct. 1358, 63 L.Ed.2d 622 (1980); *Sivak v. State,* 112 Idaho 197, 731 P.2d 192 (1986); *see also State v. Johnson,* 101 Idaho 581, 618 P.2d 759 (1980) (district court has broad discretion in determining what evidence is to be admitted at sentencing hearing); *State v. Pierce,* 100 Idaho 57, 593 P.2d 392 (1979) (the strict evidentiary rules which govern guilt proceedings are not rigidly applied during the sentencing proceeding. The sentencing judge is presumably able to ascertain the relevancy and reliability of the broad range of information and material which may be presented to it during the sentencing process and to disregard the irrelevant and unreliable). The record in the instant case reveals that Pizzuto was given ample opportunity to rebut testimony and evidence presented at the sentencing hearing and to present additional evidence in mitigation. Pizzuto has not identified or directed our attention to any prejudice resulting from non-disclosure or advance notice or warning of those aggravating circumstances relied upon by the State that could not have been cured by resort to the protections afforded by I.C. § 19–2515. We therefore conclude and hold that Pizzuto's right to due process of law under the United States Constitution and the Idaho Constitution, were not violated as a result of non-disclosure by the State prior to trial of evidence relating to aggravating circumstances to be relied upon in support of seeking the death penalty.

## X. *I.C. § 19–2515 Creates Mandatory Presumption in Favor of Death Penalty.*

■ Pizzuto contends that I.C. § 19–2515 violates his constitutional rights in that it creates a mandatory presumption in favor of the death penalty which violates the individualized sentencing determination required by the eighth amendment to the United States Constitution and similar safeguards in art. 1, § 6 of the Idaho Constitution. Pizzuto also asserts that I.C. § 19–2515 improperly places the burden on the defendant to prove that mitigating circumstances exist which outweigh the gravity of any aggravating circumstance. The portion of I.C. § 19–2515 at issue is the following:

(c) ... Where the court finds a statutory aggravating circumstance the court shall sentence the defendant to death unless the court finds that mitigating circumstances which may be presented outweigh the gravity of any aggravating circumstances found and make imposition of death unjust.

Pizzuto requests that this Court re-examine its decision in *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981), in which the Court resolved whether I.C. § 19–2515 constitutes an impermissible shifting of the burden of proof to the defendant. In *Osborn* this Court held:

Here we are not concerned with proof of an element of the offense but rather are engaged in an inquiry into all relevant facts and circumstances which might weigh upon the propriety of capital punishment. The weighing process, in our opinion does not involve shifting the burden of persuasion but is concerned instead with the presentation of relevant information to the sentencer in order that a reasoned and considered decision can be reached. The defendant's burden is merely to raise, in the aggravation-mitigation hearing, any factors which might possibly tend to mitigate his culpability for the offense. He has full opportunity to present and argue those factors. The court below then evaluates those factors under the guidelines set forth in the statute. His decision, including his reasoning, is then set forth in detail and this court reviews the entire process. While it is possible to speak of a "burden" of persuasion on the defendant to establish why he should receive leniency, we feel that, under our sentencing process, the facts speak for themselves once presented. The completeness of the evaluative process below and the mandatory review by this court, we feel, withstands constitutional scrutiny. (Citations omitted.)

Pizzuto relies primarily on *Adamson v. Ricketts*, 865 F.2d 1011 (9th Cir.1988), in which the Ninth Circuit Court of Appeals held that the Arizona death penalty statute, which is very similar to Idaho's statute, created an unconstitutional presumption in favor of the death penalty.[8] Specifically, Pizzuto contends that I.C. § 19–2515 does not define the burden of proof placed on the defendant in proving the mitigating factors. Additionally, Pizzuto contends that I.C. § 19–2515 also fails to define how the judge should weigh the mitigating factors against the aggravating factor. Pizzuto asserts that a presumption of death is created because there is no standard for determining the degree of proof required to show the existence of a mitigating circumstance, or what the standard is for weighing the mitigating circumstances against the aggravating circumstance.

The United States Supreme Court reviewed the Arizona death penalty statute in *Walton v. Arizona*, —— U.S. ——, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990). As in *Adamson*, the defendant challenged the Arizona death penalty statute on the basis that it created a presumption of death because A.R.S. § 13–703(E) provides that the court "shall" impose the death penalty if one or more aggravating circumstances are found and mitigating circumstances are held insufficient to call for leniency. In *Boyde v. California*, 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990) and *Blystone v. Pennsylvania*, 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990), the United States Supreme Court recently upheld similar statutes.

In *Blystone v. Pennsylvania*, the Supreme Court upheld a jury instruction which was based on a Pennsylvania statute. The instruction stated that the death penalty must be imposed if aggravating circumstances were found to exist but no mitigating circumstances were present. The Supreme Court in *Blystone*, held that "the requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence," 494 U.S. at ——, 110 S.Ct. at 1083 (footnote omitted), and concluded that because the Pennsylvania statute did not preclude the sentencer from considering any type of mitigating evidence, *id.*, at ——, 110 S.Ct. at 1084, that it was harmonious with that principle. The Supreme Court also concluded that the statute was not "impermissibly mandatory" as that term was understood in *Roberts v. Louisiana*, 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976), and *Woodson v. North Carolina*, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), because it did not automatically impose death upon conviction for

---

**8.** The pertinent part of the Arizona statute, as quoted in *Adamson*, is as follows:

Arizona revised statute § 13–703(e) reads in relevant part: "the court ... shall impose a sentence of death if the court finds one or more of the aggravating circumstances sufficiently substantial to call for leniency."
*Adamson v. Ricketts*, 865 F.2d 1011, 1042 (9th Cir.1988).

certain types of murder. 494 U.S. at ——, 110 S.Ct. at 1089. The same is true of the Arizona statute. *Walton v. Arizona,* —— U.S. at ——, 110 S.Ct. at 3050, 111 L.Ed.2d at ——.

In *Boyde v. California,* 494 U.S. ——, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), the Supreme Court upheld a jury instruction which stated that "[i]f you conclude the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death." *Walton v. Arizona,* 497 U.S. ——, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), citing from *Boyde v. California.* The instruction was upheld on the basis that the jury was instructed that it was allowed to consider "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." *Id.* at 10, 110 S.Ct. at 1198.

With regard to eighth amendment protections, the Supreme Court has held that the fundamental consideration is whether the particular death penalty statute allows for individualizing sentencing determinations by requiring the consideration of the character and record of the individual offender and the circumstances of the particular offense. *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976); *see also Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). The three recent United States Supreme Court cases discussed above, *Walton v. Arizona,* —— U.S. ——, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), *Blystone v. Pennsylvania,* 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990), and *Boyde v. California,* 494 U.S. 370, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), all held that the statute or jury instruction in question conformed to the constitutional requirements of the eighth amendment on the basis that the sentencer was allowed to consider all evidence that may make the defendant less culpable than another who had committed the same crime and thus allows individualized sentencing.

In *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), the Supreme Court reviewed an Oklahoma case in which the sentencing judge refused to consider in mitigation certain evidence concerning the defendant's unhappy childhood and upbringing. The issue raised in *Eddings,* was whether the sentencer could refuse to consider any relevant mitigating evidence. The United States Supreme Court held that the sentencer could not refuse to consider such evidence, but that the "sentencer ... may determine the weight to be given relevant mitigating evidence." 455 U.S. at 114–15, 102 S.Ct. at 877. The United States Supreme Court held in *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), that because the Georgia sentencing procedures focus the jury's attention on the particularized nature of the crime and the particularized characteristics of the individual defendant, that the jury's discretion is properly channeled.

In *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Supreme Court reviewed Georgia's capital sentencing procedures which are similar to those of Idaho. Georgia's sentencing statute required that at least one of several designated aggravating circumstances must exist before a defendant may be sentenced to death. The Georgia sentencing procedure also states that the sentencer, which under Georgia law is a jury, "is authorized to consider any other appropriate aggravating or mitigating circumstances." 428 U.S. at 197, 96 S.Ct. at 2936, 49 L.Ed.2d at 888. Additionally, the sentencing procedures in Georgia require an automatic appeal of all death sentences to the Georgia Supreme Court which is required to review each sentence to determine whether it was imposed under the influence of passion or prejudice. In addition, *Gregg v. Georgia* held that the review function of the Supreme Court of Georgia affords additional assurance that the death sentence will not be imposed in an arbitrary and capricious manner. *See generally Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972).

In *State v. Charboneau,* 116 Idaho 129, 774 P.2d 299 (1989), this Court considered essentially the same argument propounded by Pizzuto and held that I.C. § 19–2515(c) does not create a presumption in favor of

the death penalty. In view of the foregoing cases we hold that I.C. § 19–2515 does not create a presumption in favor of the death penalty because it does not expressly state how the sentencing judge is to weigh the mitigating evidence. As the Supreme Court held in *Eddings v. Oklahoma,* the sentencer may determine what weight to place on mitigating evidence. A presumption in favor of the death penalty is not created because the Oklahoma statute does not designate a burden of proof requirement by which a defendant must prove mitigating circumstances. Like the Georgia sentencing procedures which were upheld by the United States Supreme Court in *Gregg v. Georgia,* Idaho capital sentencing procedures provide for individual sentencing and safeguards against arbitrary and capricious imposition of the death penalty. In *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981), this Court held that the completeness of the evaluative process at the time of sentencing, and the mandatory review by this Court withstands constitutional scrutiny. Idaho Code § 19–2515 allows flexibility in sentencing by allowing the sentencer to consider all relevant mitigating evidence without limiting the mitigating factors that may be considered. We therefore hold that I.C. § 19–2515 does not create a presumption in favor of the death penalty and does not violate the eighth amendment's prohibition against cruel and unusual punishment. *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981).

### XI. *No Violation of Right to Confrontation.*

■ Pizzuto contends that his sixth amendment right to cross-examine adverse witnesses was violated at his sentencing hearing. Although the State called both the Idaho presentence investigator and the Michigan presentence investigator as witnesses at sentencing, Pizzuto asserts that this did not allow him to adequately confront the sources of the information relied on by the presentence investigators in the preparation of the report.

The United States Supreme Court has held that due process requires that the contents of a presentence report in a capital case must be revealed to the defendant so that he may have the opportunity to explain or argue the accuracy of the information contained in that report. *Gardner v. Florida,* 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). In *State v. Creech,* 105 Idaho 362, 670 P.2d 463 (1983), this Court held that the United States Constitution does not mandate that a sentencing decision be made on the basis of live testimony. Based on the policy reasons set forth in *Williams v. New York,* 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949), this Court held the "sixth amendment to the United States Constitution does not require that a capital defendant be afforded the opportunity to confront and cross-examine live witnesses in his sentencing proceeding." *Sivak v. State,* 112 Idaho 197, 216, 731 P.2d 192, 211 (1986); *State v. Creech,* 105 Idaho 362, 670 P.2d 463 (1983).

On the day of sentencing, Pizzuto requested that the trial court grant a continuance and provide funds to send counsel to Michigan to interview the witnesses who provided information to Berro, or as an alternative, to hire an investigator in Michigan to "check out these stories." Pizzuto acknowledged at that time that neither he nor his attorney had previously requested the court to provide funds for an investigator or to subpoena the Michigan victim. The sentencing judge denied the request for a continuance on the basis that Pizzuto had adequate opportunity and time prior to sentencing to make such requests. We agree. Pizzuto had adequate time to take whatever steps he felt necessary to gather information to rebut the evidence contained in the presentence report. Rather, Pizzuto waited until the sentencing hearing to request assistance in gathering such information. We hold under the circumstances that no prejudicial or reversible error resulted from Pizzuto not having an opportunity to cross-examine each source of the information contained in the presentence reports.

### XII. *Participation of Jury in Sentencing.*

■ Pizzuto acknowledges that there is no constitutional guarantee to have a jury

determine the appropriate punishment. *Clemons v. Mississippi*, 494 U.S. ——, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990); *Hildwin v. Florida*, 490 U.S. 638, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989); *Spaziano v. Florida*, 468 U.S. 447, 104 S.Ct. 3154, 82 L.Ed.2d 340 (1984). However, he urges this Court to reexamine its decisions in *State v. Sivak*, 105 Idaho 900, 674 P.2d 396 (1983), and *State v. Creech*, 105 Idaho 362, 670 P.2d 463 (1983). We decline to review this issue further in light of the long line of Idaho cases clearly establishing that punishment in a capital case is to be determined by a judge rather than a jury. *State v. Lankford*, 116 Idaho 860, 781 P.2d 197 (1989); *State v. Charboneau*, 116 Idaho 129, 774 P.2d 299 (1989); *State v. Fain*, 116 Idaho 82, 774 P.2d 252 (1989); *State v. Beam*, 109 Idaho 616, 710 P.2d 526 (1985); *State v. Fetterly*, 109 Idaho 766, 710 P.2d 1202 (1985), *cert. denied*, 479 U.S. 870, 107 S.Ct. 239, 93 L.Ed.2d 164 (1986); *State v. Sivak*, 105 Idaho 900, 674 P.2d 396 (1983), *cert. denied*, 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984); *State v. Creech*, 105 Idaho 362, 670 P.2d 463 (1983), *cert. denied*, 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 722 (1984); *see also Walton v. Arizona*, —— U.S. ——, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990).

In *Walton v. Arizona*, the United States Supreme Court reviewed and upheld the Arizona sentencing statute which provides that once a defendant is found guilty by the jury of first degree murder, a separate sentencing hearing is held before the trial judge. Under the Arizona statute the trial judge determines whether there exists aggravating and mitigating circumstances and is directed to impose a death sentence if he or she finds one or more of the enumerated aggravating circumstances [9] and that there are no mitigating circumstances sufficiently substantial to call for leniency.

As this Court has repeatedly held, we now reaffirm the well established principle that I.C. § 19–2515 which provides that a judge rather than a jury impose sentence in a capital case does not violate a defendant's constitutional rights. We have held on numerous occasions that there is no federal constitutional requirement of jury participation in the sentencing process and that the decision to have jury participation in the sentencing process, as contrasted with judicial discretion sentencing, is within the policy determination of the individual states. *State v. Lankford*, 116 Idaho 860, 781 P.2d 197 (1989); *State v. Charboneau*, 116 Idaho 129, 145, 774 P.2d 299, 315 (1989); *State v. Creech*, 105 Idaho 362, 670 P.2d 463 (1983), *cert. denied*, 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 722 (1984); *see also State v. Fetterly*, 109 Idaho 766, 710 P.2d 1202 (1985); *State v. Sivak*, 105 Idaho 900, 674 P.2d 396 (1983), *cert. denied*, 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984). In *State v. Charboneau*, 116 Idaho 129, 774 P.2d 299, *cert. denied*, —— U.S. ——, 110 S.Ct. 287, 107 L.Ed.2d 267 (1989), this Court carefully analyzed existing case law and held that sentencing by a judge

---

9. A.R.S. § 13–703. **Sentence of death or life imprisonment without possibility of release until the defendant has served a prescribed period of time; aggravating and mitigating circumstances**

....

E. In determining whether to impose a sentence of death or life imprisonment ... the court shall take into account the aggravating and mitigating circumstances included in subsections F of this section and that there are no mitigating circumstances sufficiently substantial to call for leniency.

F. Aggravating circumstances to be considered shall be the following:

1. The defendant has been convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was possible.

2. The defendant was previously convicted of felony in the United States involving the use or threat of violence on another person. 3. In the commission of the offense the defendant knowingly created a grave risk of death to another person or persons in addition to the victim of the offense.

....

6. The defendant committed the offense in an especially heinous, cruel or depraved manner. .

....

8. The defendant has been convicted of one or more other homicides, as defined in § 13–1101, which were committed during the commission of the offense.

....

rather than a jury does not violate the defendant's constitutional rights. *See also State v. Paz*, 118 Idaho 542, 798 P.2d 1 (1990). Furthermore, this Court has specifically held that participation of a jury in the sentencing process in a capital case is not required under art. 1, § 7 of the Idaho Constitution. *State v. Beam*, 109 Idaho 616, 710 P.2d 526 (1985); *State v. Sivak*, 105 Idaho 900, 674 P.2d 396 (1983), *cert. denied*, 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984); *see also State v. Lankford*, 116 Idaho 860, 781 P.2d 197 (1989).

We therefore hold it was not error in the instant case for the trial judge rather than a jury to determine and impose Pizzuto's sentence.

### XIII. *Whether Sentencing Statute Lists Elements of the Crime.*

■ Pizzuto asserts that the Idaho statutory scheme for imposing the death penalty violates his sixth and fourteenth amendment rights under the United States Constitution, and similar provisions under the Idaho Constitution. Pizzuto contends that I.C. § 19–2515 erroneously lists elements of the offense as factors to be considered and determined by the sentencing judge in violation of the defendant's right to have a jury's determination on the elements of the crime.

Pizzuto relies primarily on *Adamson v. Ricketts*, 865 F.2d 1011 (9th Cir.1988), a United States Ninth Circuit Court of Appeals case wherein Arizona's death penalty statute, which is very similar to Idaho's statute, was held unconstitutional for several reasons, including Pizzuto's argument in this section. However, the United States Supreme Court reviewed the same issues in *Walton v. Arizona*, — U.S. —, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), and citing *Poland v. Arizona*, 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986), held:

> Aggravating circumstances are not separate penalties or offenses, but are "standards to guide the making of [the]

choice" between the alternative verdicts of death and life imprisonment. Thus, under Arizona's capital sentencing scheme, the judge's finding of any particular aggravating circumstance does not of itself "convict" a defendant (i.e., require the death penalty), and the failure to find any particular aggravating circumstance does not "acquit" a defendant (i.e., preclude the death penalty).

*Id.* at 156, 106 S.Ct. at 1755. (Citation omitted.) The Supreme Court held in *Walton* that a state is not required to denominate aggravating circumstances as "elements" of the offense or to permit only a jury to determine the existence of such circumstances. The Supreme Court in *Walton* concluded that the Arizona capital sentencing scheme does not violate the sixth amendment. Likewise, the Idaho sentencing scheme does not violate constitutional safeguards and protections. *Walton v. Arizona*, — U.S. —, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990); *Poland v. Arizona*, 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986).

### XIV. *Aggravating Circumstances.*

■ The trial court found the following statutory aggravating circumstances: (1) that at the time Pizzuto murdered Del Herndon, he also murdered Berta Herndon; (2) the murders of the Herndons were especially heinous, atrocious, cruel, and manifested exceptional depravity; (3) by the murder and the circumstances surrounding it's commission, the defendant exhibited utter disregard for human life; (4) the murders were accompanied with the specific intent to cause the deaths of the Herndons; (5) the defendant by prior conduct and by conduct in the commission of the murders in this case has exhibited a propensity to commit murder which will constitute a continuing threat to society.

Pizzuto asserts that three of the aggravating circumstances contained in I.C. § 19–2515 [10] are vague and overbroad, and

---

10. **19–2515(g)** The following are statutory aggravating circumstances, at least one (1) of which must be found to exist beyond a reason-

able doubt before a sentence of death can be imposed:

(1) The defendant was previously convicted of another murder.

therefore violate the eighth amendment to the United States Constitution and art. 1 § 6 of the Idaho Constitution. The three challenged enumerated aggravating circumstances under I.C. § 19–2515 are:

(g)(5): The murder was especially heinous, atrocious, or cruel manifesting exceptional depravity;

(g)(6): By the murder, or circumstances surrounding its commission, the defendant exhibited utter disregard for human life.

(g)(8): The defendant, by prior conduct or conduct in the commission of the murder at hand has exhibited a propensity to commit murder which will probably constitute a continuing threat to society.

Pizzuto admits that this issue has been previously addressed and repeatedly upheld by this Court, however he asserts that there is substantial authority contrary to the position taken by this Court which holds that the challenged aggravating circumstances are unconstitutionally vague.

■ Under the eighth amendment a claim based on vagueness is analyzed by determining whether the challenged aggravating circumstance adequately informs the sentencer what it must find in order to impose the death penalty, or whether it leaves the sentencer with unchanneled discretion to make an arbitrary and capricious decision. *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988); *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *see also Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). In *Godfrey v.*

*Georgia*, 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), the United States Supreme Court held that where the statutory language defining the aggravating circumstance is itself vague, there must be a limiting construction if the state is to meet its constitutional obligation to "tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." 446 U.S. at 428, 100 S.Ct. at 1764.

This Court previously adopted a limiting construction to the "heinous, atrocious and cruel" language contained in I.C. § 19–2515(g)(5). In *State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981), this Court adopted language used by the Florida Supreme Court and which was approved in *Proffitt v. Florida*, 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *see also State v. Charboneau*, 116 Idaho 129, 774 P.2d 299 (1989). In *Osborn*, this Court also adopted the language defining "exceptional depravity" used by the Nebraska Supreme Court in *State v. Simants*, 197 Neb. 549, 250 N.W.2d 881, *cert. denied*, 434 U.S. 878, 98 S.Ct. 231, 54 L.Ed.2d 158, *reh. denied*, 434 U.S. 961, 98 S.Ct. 496, 54 L.Ed.2d 322 (1977). In *State v. Charboneau*, 116 Idaho 129, 774 P.2d 299 (1989), this Court held that the language adopted in *Osborn* removes the vagueness from I.C. § 19–2515(g)(5) and hence there is no violation of the eighth amendment based on *Maynard v. Cartwright*, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). Following *Charboneau*, this Court again reviewed and upheld I.C. § 19–2515(g)(5) in *State v.*

---

(2) At the time the murder was committed the defendant also committed another murder.
(3) The defendant knowingly created a great risk of death to many persons.
(4) The murder was committed for remuneration or the promise of remuneration or the defendant employed another to commit the murder for remuneration or the promise of remuneration.
(5) The murder was especially heinous, atrocious or cruel, manifesting exceptional depravity.
(6) By the murder, or circumstances surrounding its commission, the defendant exhibited utter disregard for human life.
(7) The murder was one defined as murder of the first degree by section 18–4003, Idaho

Code, subsections (b), (c), (d), (e) or (f), and it was accompanied with the specific intent to cause the death of a human being.
(8) The defendant, by prior conduct or conduct in the commission of the murder at hand, has exhibited a propensity to commit murder which will probably constitute a continuing threat to society.
(9) The murder was committed against a former or present peace officer, executive officer, officer of the court, judicial officer or prosecuting attorney because of the exercise of official duty.
(10) The murder was committed against a witness or potential witness in a criminal or civil legal proceeding because of such proceeding.

*Lankford,* 116 Idaho 860, 781 P.2d 197 (1989).

In *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), the United States Supreme Court held that the aggravating circumstance provision of an Oklahoma death penalty statute which referred to especially heinous, atrocious or cruel murders was unconstitutionally vague in violation of the eighth amendment. However, in *State v. Lankford,* 116 Idaho 860, 781 P.2d 197 (1989), this Court upheld the use of the same language contained in I.C. § 19–2515. This Court distinguished Idaho's statutory language from that in the Oklahoma statute on the basis that Oklahoma has jury sentencing while Idaho adheres to judicial sentencing in capital murder cases.

These aggravating circumstances are terms of art that are commonly understood among the members of the judiciary. As a result, the potential for inconsistent application that exists as a result of jury sentencing is eliminated where the judge sentences.

116 Idaho at 877, 781 P.2d at 214. The constitutionality of the language defining "heinous, atrocious and cruel" and "exceptional depravity" has not changed since *State v. Lankford,* and we hold that the limiting construction placed on I.C. § 19–2515(g)(5) does not violate the eighth amendment prohibition against cruel and unusual punishment.

■ Pizzuto also asserts that the statute and the limiting construction of the aggravating circumstance defined in I.C. § 19–2515(g)(6) is unconstitutionally vague wherein it states, "[b]y the murder, or circumstances surrounding its commission, the defendant demonstrated utter disregard for human life." Pizzuto contends that this statutory language and its limiting construction does not objectively guide the sentencer's discretion and narrow the application of the death penalty as mandated by *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980). In *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981), a limiting construction was placed on I.C. § 2515(f)(6) and this Court

held, "the phrase is meant to be reflective of acts or circumstances surrounding the crime which exhibit the highest, the utmost, callous disregard for human life, i.e., the cold-blooded, pitiless slayer." In *Osborn* and in subsequent cases we have held that this limiting construction meets constitutional standards. *State v. Charboneau,* 116 Idaho 129, 774 P.2d 299 (1989); *Gibson v. State,* 110 Idaho 631, 718 P.2d 283 (1986); *State v. Aragon,* 107 Idaho 358, 690 P.2d 293 (1984); *State v. Creech,* 105 Idaho 362, 670 P.2d 463 (1983). We continue to adhere to that position and reaffirm our prior holdings that I.C. § 2515(g)(6) is not unconstitutionally vague.

■ Pizzuto also asserts that I.C. § 19–2515(g)(8) is impermissibly vague. In *State v. Creech,* 105 Idaho 362, 670 P.2d 463 (1983), this Court upheld the aggravating circumstances as being constitutional. In doing so the Court discussed its construction of the word "propensity" as follows:

We would construe "propensity" to exclude, for example, a person who has no inclination to kill but in an episode of rage, such as during an emotional family or lover's quarrel, commits the offense of murder. We would doubt that most of those convicted of murder would again commit murder, and rather we construe the "propensity" language to specify that person who is a willing, predisposed killer, a killer who tends toward destroying the life of another, one who kills with less than the normal amount of provocation. We would hold that propensity assumes a proclivity, a susceptibility, and even an affinity toward committing the act of murder.

*Id.* at 370–71, 670 P.2d at 471–72. The Court noted language similar to that just quoted, was upheld by the United States Supreme Court in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). In *State v. Sivak,* 105 Idaho 900, 674 P.2d 396 (1983), this Court reaffirmed the constitutionality of I.C. § 19–2515(g)(8). We find no reason to reconsider our opinions in those cases.

Pizzuto additionally asserts that the evidence does not support a finding under these three enumerated statutory aggravating circumstances. Idaho Code § 19–2515(g)(5) states, "[t]he murder was especially heinous, atrocious or cruel, manifesting exceptional depravity." The limiting construction adopted in *Osborn*, and applicable to I.C. § 19–2515(g)(5), is as follows:

> [W]e feel that the meaning of such terms is a matter of common knowledge, so that an ordinary man would not have to guess at what was intended. It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies—the conscienceless or pitiless crime which is unnecessarily torturous to the victim.
>
> . . . .
>
> In interpreting this portion of the statute, the key word is "exceptional." It might be argued that every murder involves depravity. The use of the word "exceptional," however, confines it only to those situations where depravity is apparent to such an extent as to obviously offend all standards of morality and intelligence.

102 Idaho at 418, 631 P.2d at 200.

In the instant case, in support of its finding that the murder was especially heinous, atrocious or cruel, manifesting exceptional depravity, the trial court stated the following:

> The defendant approached his victims at a remote cabin in Idaho County near McCall, Idaho. He pulled a gun on them, he forced Mr. Herndon to drop his pants and crawl into the cabin, he bound their arms and legs, and then proceeded to smash in the back of their skulls with a hammer. The manner in which this unprovoked and calculated killing was accomplished exhibits a depravity which exceeds all comprehension, explanation, and human decency.

The especially heinous section of the statute refers to the manner in which the crime was committed. *State v. Fain*, 116 Idaho 82, 774 P.2d 252 (1989). In examining the manner and method in which Pizzuto murdered the Herndons we hold that the evidence supports a finding that the murders were especially heinous, atrocious or cruel, manifesting exceptional depravity. Idaho Code § 19–2515(g)(5).

The facts of this case are strikingly similar to those in *State v. Lankford*, 116 Idaho 860, 781 P.2d 197 (1989), in which a married couple was killed. The husband was ordered by Lankford to kneel down in front of him and was killed when Lankford struck him in the back of the head with a nightstick. When the wife rushed to the side of her mortally wounded husband, Lankford ordered her to kneel down beside her husband's body, and she was struck in the back of the neck with the same nightstick. In *Lankford* this Court affirmed the trial court's findings and stated:

> The brutal manner in which Lankford bludgeoned the skulls of his two victims clearly supports the trial court's finding that the murders were especially heinous, atrocious or cruel manifesting exceptional depravity.

116 Idaho at 877, 781 P.2d at 214.

The facts of this case and *Lankford* are strikingly similar. Here, Pizzuto ordered Delbert Herndon to drop his trousers to his knees and crawl into the cabin, where he bludgeoned him with a hammer. Likewise, Mrs. Herndon was similarly beaten to death with hammer blows to the head. The brutal manner in which the Herndons were murdered clearly supports the trial court's finding that the murders were especially heinous, atrocious or cruel manifesting exceptional depravity. Idaho Code § 19–2515(g)(5).

Idaho Code § 19–2515(g)(6) states, "[b]y the murder, or circumstances surrounding its commission, the defendant exhibited utter disregard for human life." In

support of a finding that Pizzuto demonstrated utter disregard for human life the trial court stated:

> The defendant approached the Herndons at gunpoint and tied them up for the purpose of stealing from them. The circumstances demonstrate the Herndons posed no threat to the Defendant's safety or to his escape from the scene of the robbery. The killing was accomplished not out of rage, revenge, or for personal gain. The murders were cold-blooded and pitiless. The killing was committed for the sake of killing.

The evidence does support a finding of utter disregard for human life under I.C. § 19–2515(g)(6). Pizzuto approached Mr. Herndon with a gun, then made him drop his pants and crawl into the cabin where he proceeded to bludgeon the skulls of both of his victims with a hammer. He then left them lying on the floor to die and Mr. Herndon was left lying on the floor of the cabin convulsing. The evidence supports a conclusion that the murders were unprovoked, conscienceless and pitiless. Following the murders, Pizzuto went back to a motel room, drank beer with his cohorts and had pictures taken of himself flaunting the pistol he stole from his victims. He joked and bragged about the killings with his associates. Pizzuto demonstrated no remorse for his actions. We therefore hold that these acts surrounding the crime exhibit the highest and utmost callous, utter disregard for human life and support the trial court's finding in aggravation under I.C. § 19–2515(g)(6).

▮ Pizzuto also asserts that the evidence was insufficient to support a finding under I.C. § 19–2515(g)(8) which states, "[t]he defendant, by prior conduct or conduct in the commission of the murder at hand, has exhibited a propensity to commit murder which will probably constitute a continuing threat to society."

In *State v. Creech*, 105 Idaho 362, 670 P.2d 463 (1983), this Court upheld the trial court's finding that the defendant demonstrated a propensity to commit murder. Creech had committed murder at least four other times, and there were pending charges against him for first degree murder. Psychiatric evidence tended to show that Creech was violent and vengeful and that he experienced no remorse for his actions. Additionally, Creech claimed to have murdered approximately forty people. In the instant case, although Pizzuto has not committed as many murders as did Creech, the evidence does support a finding that Pizzuto has exhibited a propensity to commit murder.

At the sentencing hearing the evidence included two outstanding warrants for the arrest of Pizzuto charging him with first degree murder in connection with two murders in the state of Washington. There was also testimony that Pizzuto had joked and boasted about killing other individuals. At various times he had threatened his jailers by claiming to be in the mafia and that he would seek revenge upon his release from prison. Pizzuto's ex-wife testified concerning the many violent beatings she suffered at the hands of Pizzuto. The psychiatric evidence admitted at the time of sentencing tended to show that Pizzuto is violent and shows no remorse for his actions. This evidence, combined with the unprovoked murder of the Herndons, supports a finding that Pizzuto kills with less than the normal amount of provocation and is a willing killer who tends toward destroying the life of another. The evidence supports the trial court's finding that Pizzuto exhibits a propensity to commit murder which will constitute a continuing threat to society.

▮ Additionally, Pizzuto submits that the judge's finding under I.C. § 19–2515(g)(6) is duplicative of the findings under (g)(2) and (g)(7). In *Osborn*, this Court held that the phrase "utter disregard" must be viewed in reference to acts other than those set forth in I.C. §§ 19–2515(g)(2), (3) and (4). *See* footnote No. 10. The record does not support Pizzuto's assertion that the sentencing judge's findings were duplicative or overlapping with regard to the above stated aggravated circumstances.

D.

## POST–CONVICTION RELIEF

XV. *Denial of Expert Assistance in Preparation of Post–Conviction Relief.*

██ Pizzuto contends that the trial court denied him due process of law and equal protection of the laws by refusing to appoint an attorney to render an expert opinion regarding trial counsel's performance. Pizzuto also requested a psychiatrist or neurologist to examine him to review the evaluations that were conducted on Pizzuto prior to trial and sentencing.

██ Pizzuto made no showing of ineffective assistance of counsel. He did not request another attorney to represent him, only that he be appointed a consulting attorney to evaluate the performance of his attorney. Where a defendant was provided with an attorney at public expense, his request for additional counsel is a matter committed to the sound discretion of the trial court. *State v. Dallas,* 109 Idaho 670, 710 P.2d 580 (1985). Absent a showing of ineffective assistance of counsel, the trial court did not abuse its discretion by not appointing an additional attorney for Pizzuto.

██ Pizzuto's request for the appointment of a psychiatrist and a neurologist was related to an anticipated "epilepsy defense." The record demonstrates that Pizzuto had previously been examined by an epileptologist, but did not offer the epileptologist's report for the court's consideration. The court had previously granted the defendant, upon his request, funds for consultation with such an expert. The court denied additional funds for the development of expert evidence regarding the epilepsy defense on the basis that no significant evidence could likely be developed by additional consultation.

In *State v. Powers,* 96 Idaho 833, 537 P.2d 1369 (1975), this Court held:

[F]inancial assistance is not automatically mandatory, but rather depends upon [the] needs of the defendant as revealed by the facts and circumstances of each case. Before authorizing the expenditure of public funds for a particular purpose in an indigent's defense, the trial court must determine whether the funds are necessary in the interest of justice.

96 Idaho at 838, 537 P.2d at 1374. Hence, the trial court must make a determination of whether an adequate defense will be available to the defendant without the requested expert. If the answer is in the negative then the services are necessary and must be provided by the state. *State v. Bingham,* 116 Idaho 415, 776 P.2d 424 (1989), *overruled on other grounds; Estes v. State,* 111 Idaho 430, 725 P.2d 135 (1986); *State v. Olin,* 103 Idaho 391, 648 P.2d 203 (1982). This determination is within the sound discretion of the trial court. "[A] denial of a request for expert assistance will not be disturbed on appeal absent a showing that the trial court abused its discretion by rendering a decision which is clearly erroneous and unsupported by the circumstances of the case." 103 Idaho at 395, 648 P.2d at 207.

In the instant case Pizzuto was examined by a neurologist, a psychiatrist, a psychologist and an epilepsy specialist. The trial court reviewed the opinions of each of these experts, as well as that of Dr. Merikangas, a licensed psychiatrist and neurologist, who had reviewed all of Pizzuto's medical records. Our review of the trial court's determination that medical opinions of the experts did not demonstrate a sufficient basis for appointing additional experts was not an abuse of discretion. The reports did not reveal a sufficient basis to believe that Pizzuto suffered from an organic or physiological disorder which mandated further medical examinations.

We hold that under the facts in this case the trial court did not abuse its discretion by denying Pizzuto's request for additional medical or legal assistance.

XVI. *State's Failure to Disclose Letter Regarding Pizzuto's Mental Health.*

██ Pizzuto contends that the district judge did not disclose a letter from a psychiatrist, Dr. White, who had previously

written to the judge stating that he would not render an opinion because Pizzuto refused to see him. Pizzuto contends that Dr. White also wrote a second letter to the trial judge stating that Pizzuto's decision not to see him was made by a person competent to consider the ramifications of his decision.

Dr. White's comments were based on a conversation with Pizzuto which occurred in December, 1985, and on conversations with his attorneys. The second letter sent to the trial judge was dated April 30, 1986. Pizzuto argues that his attorneys did not receive a copy of the second letter nor did they become aware of its contents until after seeing the findings of fact and conclusions of law contained in the petition for post-conviction relief. Pizzuto asserts that the trial court's failure to reveal the contents of the April 30, 1985 letter constitutes reversible error. *Gardner v. Florida*, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). In *Gardner*, the United States Supreme Court reversed a death sentence on the basis that a portion of the presentence investigation report was not disclosed to the defendant. The Supreme Court based its opinion on the importance of giving counsel an opportunity to comment on facts which may influence the sentencing decision. Although due process requires that the contents of a presentence report be disclosed to the defendant prior to sentencing, and it is required that the trial court disclose all contents of a presentence report, in the instant case Pizzuto's competency and ability to understand the ramifications of his decision not to talk with Dr. White was not an issue in sentencing or at trial. Accordingly, we find no error.

### XVII. *Motion to Disqualify Judge.*

 Pursuant to I.C.R. 25(b)(4), Pizzuto requested the trial judge to disqualify himself from presiding over the post-conviction relief proceedings on the grounds that he was biased and prejudiced against Pizzuto. The trial judge denied the motion stating that he was neither biased nor prejudiced against or in favor of either party. As the basis for his claim, Pizzuto asserts that the trial judge, in questioning some of the wit-

nesses called by the defense, abandoned his role as a neutral fact finder thereby demonstrating bias and prejudice against Pizzuto. Additionally, Pizzuto contends that the trial judge was biased as a result of being exposed to extraneous information while presiding over the prosecutions of Pizzuto's companions, Rice and Odom.

 It has been held that the right to due process requires an impartial trial judge. *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); *State v. Lankford*, 116 Idaho 860, 781 P.2d 197 (1989). However, a judge may not be disqualified for prejudice unless it is shown that the prejudice is directed against the party and is of such nature and character as would render it improbable that under the circumstances the party could have a fair and impartial trial. *State v. Lankford, id; State v. Waterman*, 36 Idaho 259, 210 P. 208 (1922); *Bell v. Bell*, 18 Idaho 636, 111 P. 1074 (1910). In order to constitute legal bias or prejudice, allegations of prejudice in post-conviction and sentence reduction proceedings must state facts that do more than simply explain the course of events involved in a criminal trial. *State v. Lankford*, 113 Idaho 688, 701, 747 P.2d 710, 723 (1987). "In Idaho a judge cannot be disqualified for actual prejudice unless it is shown that the prejudice is directed against the litigant and is of such a nature and character that it would make it impossible for the litigant to get a fair trial." *State v. Lankford*, 113 Idaho 688, 700, 747 P.2d 710, 722 (1987); *State v. Waterman*, 36 Idaho 259, 210 P. 208 (1922). Whether the judge's involvement in the defendant's case reaches the point where disqualification from further participation in a case becomes necessary is left to the sound discretion of the trial judge. *State v. Sivak*, 112 Idaho 197, 731 P.2d 192 (1987).

Pizzuto does not provide this Court with any insight as to what information Judge Reinhardt may have received while presiding over the prosecutions of Rice and Odom. If in fact Judge Reinhardt had been exposed to prejudicial information, "[t]hat judges are capable of disregarding that which should be disregarded is a well

777

accepted precept in our judicial system." *Sivak v. State*, 112 Idaho 197, 205, 731 P.2d 192, 200 (1986), citing, *Ford v. Strickland*, 696 F.2d 804, 811 (11th Cir.1983), *cert. denied*, 464 U.S. 865, 104 S.Ct. 201, 78 L.Ed.2d 176 (1983) (citing *Harris v. Rivera*, 454 U.S. 339, 345, 102 S.Ct. 460, 464, 70 L.Ed.2d 530, 536 (1981)).

Upon reviewing the record we find no basis to believe that the purpose of the trial court's examination of witnesses was in an attempt to elicit testimony favorable to the State's position. However, even if this motivation alleged by Pizzuto were true, Pizzuto failed to specify the exact incidents of this alleged misconduct. Pizzuto therefore asks us to speculate as to the motivation behind Judge Reinhardt's questions to determine if he was prejudiced against Pizzuto. *See generally State v. Lankford*, 116 Idaho 860, 781 P.2d 197 (1989). We find this assertion to be without merit and we find no abuse of discretion by the trial court.

## E.

## AUTOMATIC REVIEW

 This Court is required by statute to review all cases where the death penalty has been imposed. Idaho Code § 19–2827. In doing so, it is our duty to insure (1) that the death sentence was not imposed under the influence of passion or prejudice; (2) that the evidence supports the judge's finding of statutory aggravating circumstances; and (3) that when both the crime and the defendant are considered, a sentence of death is not excessive or disproportionate.

## XVIII. *Death Penalty Imposed Under Influence of Passion and Prejudice.*

 There is nothing in the record that indicates that the sentence of death was due to the influence of passion, prejudice or any other arbitrary factors. The evidence presented at trial supports the jury's verdict of first degree murder, robbery and grand theft. At sentencing the district court heard evidence submitted by both sides, and made findings both in mitigation and in aggravation. We hold that there is sufficient evidence to support the findings and that the sentences herein were not imposed under the influence of passion, prejudice or arbitrary factors.

## XIX. *Proportionality of the Death Sentence.*

 Counsel for Pizzuto argues that the death sentence is disproportionate when compared to other cases in which the death penalty was or was not imposed. Idaho Code § 19–2827 requires that all death sentences shall be reviewed by the Supreme Court of Idaho and that the Court shall specifically determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." Idaho Code § 19–2827c(3).

We have reviewed the sentence imposed upon Pizzuto by the trial court in light of the record and compared it with the sentences imposed in other capital cases.[11] In

11. *State v. Paz*, 118 Idaho 542, 798 P.2d 1 (1990); *State v. Lankford*, 116 Idaho 860, 781 P.2d 197, *stay granted*, 490 U.S. 1061, 109 S.Ct. 2058, 104 L.Ed.2d 623 (1989); *State v. Charboneau*, 116 Idaho 129, 774 P.2d 299 (1989); *McKinney v. State*, 115 Idaho 1125, 772 P.2d 1219 (1989); *State v. Fetterly*, 115 Idaho 231, 766 P.2d 701 (1988); *State v. Windsor*, 110 Idaho 410, 716 P.2d 1182 (1985), *cert. denied*, 479 U.S. 964, 107 S.Ct. 463, 93 L.Ed.2d 408 (1986); *State v. Scroggins*, 110 Idaho 380, 716 P.2d 1152 (1985), *cert. denied*, 479 U.S. 989, 107 S.Ct. 582, 93 L.Ed.2d 585 (1986); *State v. Stuart*, 110 Idaho 163, 715 P.2d 833 (1985); *State v. Fetterly*, 109 Idaho 766, 710 P.2d 1202 (1985), *cert. denied*, 479 U.S. 870, 107 S.Ct. 239, 93 L.Ed.2d 164 (1986); *State v. Beam*, 109 Idaho 616, 710 P.2d 526 (1985); *State v. Bainbridge*, 108 Idaho 273, 698 P.2d 335 (1985); *State v. Aragon*, 107 Idaho 358, 690 P.2d 293 (1984); *State v. McKinney*, 107 Idaho 180, 687 P.2d 570 (1984); *State v. Paradis*, 106 Idaho 117, 676 P.2d 31 (1983), *cert. denied*, 468 U.S. 1220, 104 S.Ct. 3592, 82 L.Ed.2d 888 (1984); *State v. Gibson*, 106 Idaho 54, 675 P.2d 33 (1983), *cert. denied*, 468 U.S. 1220, 104 S.Ct. 3592, 82 L.Ed.2d 888 (1984); *State v. Sivak*, 105 Idaho 900, 674 P.2d 396 (1983), *cert. denied*, 468 U.S. 1220, 104 S.Ct. 3591, 82 L.Ed.2d 887 (1984); *State v. Creech*, 105 Idaho 362, 670 P.2d 463 (1983); *State v. Major*, 105 Idaho 4, 665 P.2d 703 (1983); *State v. Mitchell*, 104 Idaho 493, 660 P.2d 1336, *cert. denied*, 461 U.S. 934, 103 S.Ct. 2101, 77 L.Ed.2d 308 (1983); *State v. Olin*, 103

making the comparison we have considered: (1) the nature of, and the motive for, the crime committed; (2) the heinous nature of the crime; and (3) the nature and character of the defendant to determine whether the sentence was proportionate and just. Upon review of the entire record with respect to these factors, and in consideration of other cases in which the death penalty was imposed and approved, we conclude that the sentences of death imposed on Pizzuto were not disproportionate or unjust.

The crimes committed in this case were intentional acts perpetrated upon two innocent campers. Pizzuto robbed them of their money and a few possessions and then unmercifully and callously murdered them. They were found buried in shallow graves with their hands and feet bound after Pizzuto had brutally beaten their heads with a hammer. Furthermore, the character and nature of these crimes leads to the conclusion that Pizzuto is an extremely dangerous man who chose unsuspecting victims and murdered without provocation. Furthermore, the murders were committed in less than a year following Pizzuto's release from a ten-year prison term for criminal sexual assault. These factors indicate that Pizzuto has little respect for the law or for the lives of other human beings. *See State v. Lankford*, 113 Idaho 688, 747 P.2d 710 (1987).

■■■■ A denial of post conviction relief will not be disturbed on appeal where there is substantial competent evidence supporting denial. *State v. Hinkley*, 93 Idaho 872, 477 P.2d 495 (1970). Where the evidence of the defendant's guilt is proven and is such as ordinarily produces moral certainty or conviction in an unprejudiced

mind, and the result would not have been different had an error in the trial not been committed, the judgment of conviction will not be reversed. *State v. Wrenn*, 99 Idaho 506, 584 P.2d 1231 (1978); *State v. Tisdel*, 94 Idaho 329, 487 P.2d 692 (1971); *State v. Gilbert*, 65 Idaho 210, 142 P.2d 584 (1943).

We have considered the other issues raised by Pizzuto and find them to be without merit.

Accordingly, we affirm the convictions and sentences for first degree premeditated murder and felony murder. The sentence for robbery merges with felony murder and is vacated.

BAKES, C.J., concurs.

McDEVITT, J., concurs in Parts I–V and VIII–XIX, and concurs specially in Parts VI–VII.

JOHNSON, Justice, concurring and concurring specially.

I concur in the Court's opinion, except that I concur specially as to part VII (Victim Impact Statement in Presentencing Report), part XIV (Aggravating Circumstances), part XV (Denial of Expert Assistance in Preparation of Post–Conviction Relief), part XVI (State's Failure to Disclose Letter Regarding Pizzuto's Mental Health) and part XIX (Proportionality of Death Sentence).

Victim Impact Statement in
Presentence Report

I concur specially as to part VII on the basis that the trial court in this case specifically stated that it had not considered the victim impact statements in imposing the death penalty. This is similar to the state-

Idaho 391, 648 P.2d 203 (1982); *State v. Osborn*, 102 Idaho 405, 631 P.2d 187 (1981); *State v. Needs*, 99 Idaho 883, 591 P.2d 130 (1979); *State v. Lindquist*, 99 Idaho 766, 589 P.2d 101 (1979).

The cases cited above are capital cases decided subsequent to the adoption of I.C. § 19-2827. In addition to the foregoing cases we also reviewed earlier capital cases in our proportionality analysis and find no disproportionality. *State v. Gerdau*, 96 Idaho 516, 531 P.2d 1161 (1975); *State v. Powers*, 96 Idaho 833, 537 P.2d 1369 (1975), *cert. denied*, 423 U.S. 1089, 96 S.Ct.

881, 47 L.Ed.2d 99 (1976); *State v. Hokenson*, 96 Idaho 283, 527 P.2d 487 (1974); *State v. Rodriguez*, 93 Idaho 286, 460 P.2d 711 (1969); *State v. Gonzales*, 92 Idaho 152, 438 P.2d 897 (1968); *State v. Koho*, 91 Idaho 450, 423 P.2d 1004 (1967); *State v. Clokey*, 83 Idaho 322, 364 P.2d 159 (1961); *State v. Snowden*, 79 Idaho 266, 313 P.2d 706 (1957); *State v. Owen*, 73 Idaho 394, 253 P.2d 203 (1953) (considered only in terms of crime committed and penalty imposed), overruled on substantive law point in *State v. Shepherd*, 94 Idaho 227, 486 P.2d 82 (1971).

ments of the trial court in *State v. Paz,* 118 Idaho 542, ——, 798 P.2d 1, 15 (1990) that the victim impact statements there did not influence the court. In the absence of specific statements such as these, I would not find the error to be harmless.

### Aggravating Circumstances

I concur specially in part XIV. In my view, the discussion of whether there is duplication between aggravating circumstances that are found is unnecessary. When the mitigating circumstances are weighed against each of the aggravating circumstances separately, as required by *State v. Charboneau,* 116 Idaho 129, 153, 774 P.2d 299, 323 (1989), there is no reason to be concerned about duplication of some aspects of the aggravating circumstances found.

### Denial of Expert Assistance in Preparation of Post–Conviction Relief

I concur specially in part XV because the trial court ordered and received Dr. Emery's report before the sentencing hearing, Pizzuto called Dr. Emery as a witness at the sentencing hearing, and Pizzuto made no request for any further examination prior to the sentencing hearing. If Pizzuto had made a request for a neurological examination before the sentencing hearing, I believe it would have been an abuse of discretion not to have granted the request.

### Proportionality of the Death Sentence

I concur specially in part XIX. Our duty to review the proportionality of the death sentence is created by I.C. § 19–2827(c)(3). In making this determination, I do not consider that I am making an independent analysis as to whether a defendant should have been sentenced to death or not, but only whether the sentence of death imposed by the trial court can be justified by reference to the sentence in similar cases reviewed by this Court after I.C. § 19–2827(c)(3) became effective in 1977.

In making my determination of proportionality, I do not consider any sentences that were reviewed by this Court prior to the effective date of I.C. § 19–2827(c)(3).

Also, in making my determination of proportionality, I consider death penalty cases in which the trial court did not impose the death penalty. *E.g., State v. Smith,* 117 Idaho 891, 792 P.2d 916 (1990); *State v. Enno,* 119 Idaho 392, 807 P.2d 610 (1991).

BISTLINE, Justice, concurring in part and dissenting in part.

I concur in the majority's opinion, except as hereinafter discussed.

*Standard on review* (BISTLINE, J. dissenting).

I dissent from the majority's statement that the defendant must make an affirmative showing of error on a death penalty appeal. This Court, by statute, must review all death penalty cases, even if the defendant does not wish to appeal. That review requires that we examine the record independently of the presentation by the parties. I.C. § 19–2827.

*I. Evidence of other crimes* (BISTLINE, J. dissenting).

Evidence of the other crimes and acts allegedly committed by Pizzuto at some unspecified time before the crimes charged were committed is admissible to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, according to I.R.E. 404(b). However, motive or opportunity or one of the other issues listed in 404(b) must also be an issue at the trial, and is a prerequisite to the admission of evidence of other crimes or acts as substantive evidence. Here, there is no sound argument to be made to support the notion that the probative value of evidence concerning Pizzuto's alleged prior acts was not substantially outweighed by the danger of unfair prejudice, and confusion of the jury. It cannot with any certainty be said that this error was harmless.

*II. Late disclosure of the jury panel* (BISTLINE, J. dissenting).

No amount of voir dire questioning can make up for the lack of time to investigate

outside of the courtroom persons who may become jurors. The federal model of providing a list of prospective jurors prior to trial for investigation of the jury panel should be adopted by this Court.

### III. Prosecution's closing argument (BISTLINE, J. dissenting).

While I agree with the result of this part of the majority opinion, I must also question the Court's failure to highlight many of the personal beliefs and opinions uttered by the prosecutor in closing. *All* of these personal opinions were improper.

### IV. Photographs (BISTLINE, J. dissenting).

The majority upholds the district court's admission of photographs depicting these brutal murders on the basis that such provided the jury with the understanding of an essential element of the prosecution's case against the defendant. That essential element is atrociousness. However, atrociousness is nowhere part of the definition of murder, or robbery, or grand theft. In fact, atrocity is properly a consideration only for the sentencing phase of the trial, when the judge determines the sentence. I.C. § 19–2515(g)(5). *See State v. Enno,* 119 Idaho 392, 807 P.2d 610 (1991).

### XIV. Aggravating circumstances (BISTLINE, J. concurring in part, dissenting in part).

I concur in part and dissent in part to this section, because in my view only the I.C. § 19–2515(g)(8) aggravating circumstance is not vague and overbroad. The other two circumstances challenged by Pizzuto, (g)(5) and (g)(6), are vague and overbroad.

Circumstance (g)(5) is upheld by the majority because in *State v. Lankford,* 116 Idaho 860, 781 P.2d 197 (1989), the Court stated that the judge and not the jury is the interpreter of the language of (g)(5). That circumstance provides for the death penalty whenever "[t]he murder was especially heinous, atrocious or cruel, manifesting exceptional depravity." According to the majority, the fact that an expert in

terms of art—a judge—would so interpret (g)(5) allows Idaho to sidestep the Supreme Court's holding in *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988) (the aggravating circumstance in an Oklahoma death penalty statute providing for the imposition of the death penalty if the murder was especially heinous, atrocious or cruel was held unconstitutionally vague and in violation of the eighth amendment).

However, this Court's earlier expressions concerning the language of (g)(5) as revealed in *State v. Osborn,* 102 Idaho 405, 631 P.2d 187 (1981), which was released a few years before *Lankford* or *Maynard,* are highly indicative of underlying philosophy. In *Osborn,* which is cited and quoted from with approval by the majority in today's opinion, this Court adopted the Florida Supreme Court's understanding of "especially heinous, atrocious or cruel:"

> '[W]e feel that the meaning of such terms is a matter of common knowledge, so that an ordinary man would not have to guess at what was intended.'

*Osborn,* 102 Idaho at 418, 631 P.2d at 200.

I have previously commented upon our unthinking adoption of what the Florida Supreme Court has done to (g)(5), and as well what this Court has done with (g)(6). It bears repeating here:

> The cruel and unusual punishment prohibitions of the state and federal constitutions require that the sentencer's discretion in imposing the death penalty [be] limited to "minimiz[e] the risk of wholly arbitrary and capricious action." *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). The Supreme Court has held that the statutory aggravating circumstances, such as those in I.C. § 19–2515, must be given a limiting construction if the state is to meet its constitutional obligation "to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." *Godfrey v. Georgia,* 446 U.S. 420, 428, 100 S.Ct. 1759, 1764, 64 L.Ed.2d 398, 406 (1980).

Idaho Code § 19–2515(g) provides:

The following are statutory aggravating circumstances, at least one (1) of which must be found to exist beyond a reasonable doubt before a sentence of death can be imposed.

. . . .

(5) The murder was *especially heinous, atrocious or cruel, manifesting exceptional depravity.*

(6) By the murder or circumstances surrounding its commission, the defendant *exhibited utter disregard for human life.*

(Emphasis added.) In regard to the (g)(5) aggravating circumstance, the majority concludes that the following limiting construction passes constitutional muster:

It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. *What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies-the conscienceless or pitiless crime which is unnecessarily torturous to the victim.*

116 Idaho at 152, 774 P.2d at 322 (quoting *State v. Osborn,* 102 Idaho 405, 418, 631 P.2d 187, 200 (1981)) (emphasis in original).

The limiting construction given to the (g)(5) aggravating circumstance by *Osborn* and reaffirmed today by the majority, is wholly insufficient to guide the sentencer's discretion in limiting the application of the death penalty consistent with constitutional mandates. Terms beget terms. What is the *"norm"* of capital felonies? Who sets this *"norm"*? Indeed, *all* first degree murders involve the unlawful killing of another with malice aforethought. What sets this particular murder apart—not from other crimes—but from the *"norm"* of *first degree* murder? In a domestic dispute husband kills wife with a gun. Do all such murders now warrant execution? If so, it can hardly be said discretion is limited.

Also, the Osborn "limiting definition of the (g)(5)" circumstance provides that the murder must be "unnecessarily *torturous* to the victim." Clearly, however, this definition is simply duplicative of the (g)(7) circumstance which subjects defendants to death for murder by torture. In the final analysis, all first degree murders are "especially heinous, atrocious or cruel, manifesting exceptional depravity." Nothing in the majority's interpretation restricts the broad brush with which the subsection is drawn.

The (g)(6) aggravating circumstance, which requires that the defendant exhibit "utter disregard for human life," suffers from similar infirmities. Today the majority reaffirms the "limiting" construction enunciated in *Osborn:*

We conclude instead that the phrase is meant to be reflective of acts or circumstances surrounding the crime which exhibit the highest, the *utmost, callous disregard for human life, i.e., the cold blooded, pitiless slayer.*

116 Idaho at 152, 774 P.2d at 322 (emphasis added) (quoting *Osborn,* 102 Idaho at 419, 631 P.2d at 201). What first degree murderer fails to show "callous disregard for human life"? I suppose this would be the "pitiful" slayer, who, prior to delivering the fatal blow, tells the victim: "Excuse me, pardon me, I know it's inconvenient, but I must now take your life."

Furthermore, the (g)(5) and (6) aggravating circumstances are duplicative. *Every* murderer who exhibits "utter disregard for human life" commits a crime which is "especially heinous, atrocious or cruel manifesting exceptional depravity." Today, however, the majority in *State v. Fain,* 116 Idaho 82, 774 P.2d 252 (1989), concludes that the aggravating factors describe two "quite *different* kinds of culpability." The majority states:

The particularly cold-blooded killer *need not* act sadistically or in a particularly *outrageous fashion* in order to commit a killing with *utter disregard for human life.* One who commits a crime in an especially heinous way is punished for the heinousness of his crime, not because he acted with utter disregard for

human life, although it may be expected that most especially heinous, atrocious or cruel murders will have been committed with utter disregard for human life.

*Fain,* 116 Idaho at 99, 774 P.2d at 269 (emphasis added).

Thus, according to the majority, a "cold blooded killer *need not* " act in an "outrageous fashion" to commit a murder "with utter disregard for human life." I cannot fathom a first degree murder which is not carried out in an "outrageous fashion." Every premeditated murder is outrageous.

The (g)(5) and (6) subsections are nothing more than kitchen sink aggravating circumstances which enable the state to make *every* first degree murderer not just a candidate for, but an actual recipient of, the harshest and most final of all criminal penalties. As a result, the mandate to narrow the class of death-eligible murders is abandoned.

*State v. Charboneau,* 116 Idaho 129, 171–72, 774 P.2d 299, 341–42 (1989) (footnotes omitted). The considerations I discussed in *Charboneau* apply with equal force to this case.

In conclusion, it has become abundantly clear that nothing has been gained or will be gained by maintaining that death penalty sentencing should be a decision left to the collective conscience of a jury comprised of the defendant's peers. The time has come to forget and forgo the distinction that aggravating circumstances are properly elements to be considered at sentencing, but not in deciding the issue of guilt or innocence. Hopefully, one day an informed and indignant electorate will require of the legislature that it rethink and rewrite the sentencing scheme so as to put it back where it was before an innovative deputy attorney general brought about the drastic change taking the awesome responsibility out of the hands of the citizenry, and instead placing it on a district judge, making Idaho and two or three other states unique in that regard.